UNITED STATES of America, Appellee,

v.

Salvatore GUIDO, Appellant.

UNITED STATES of America, Appellee,

v.

Douglas BOYLE, Appellant.

Nos. 78–2968, 78–3175.

United States Court of Appeals,
Ninth Circuit.

May 18, 1979.

Thomas O'Toole, Federal Public Defender, and David Heller, Asst. Public Defender, for appellant, Guido.

James Hamilton Kemper, Derickson, Kemper & Henze, Phoenix, Ariz., for appellant, Boyle.

Dale A. Danneman, Asst. U. S. Atty., Phoenix, Ariz., for appellee.

Before CHOY and ANDERSON, Circuit Judges, and BARTELS,* District Judge.

PER CURIAM:

Salvatore Guido and Douglas Boyle appeal from convictions entered in the United States District Court for the District of Arizona (Craig, *J.*) after a bench trial. They were convicted under Count II of an indictment charging conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846. Prior thereto, they had been convicted in the Eastern District of California of a conspiracy which they claim to be identical although covering a different period. They contend that the Arizona prosecution violated their rights under the Fifth Amendment not to be (a) twice placed in jeopardy and (b) deprived of due process by being subjected to piecemeal prosecution.

This appeal involves two indictments and convictions. The first indictment, charging defendants with conspiracy to import mari-

---

* The Honorable John R. Bartels, United States District Judge for the Eastern District of New York, sitting by designation.

juana from April 29, 1977 through May 12, 1977, was returned on May 17, 1977 and the second indictment, charging defendants with conspiracy to import and possess marijuana with intent to distribute from March 1, 1976 through November 15, 1976, was returned on May 2, 1978. Although the Arizona indictment was returned second, it covered a period prior to the period covered by the earlier California indictment. In its brief and argument, the government characterized the two time periods as separate conspiracies. We believe, however, that the activities within the time period as a whole must be considered to determine whether there is one or more conspiracies.

## The Arizona Indictment

The facts adduced under the Arizona indictment establish that in Phoenix, Arizona, in February or March 1976, Doyle Rowland approached an acquaintance, Gordon House, and requested that he act as a pilot to fly marijuana from Mexico into the United States for the defendant Guido. Guido explained to House that he had contacts in Portland, Oregon who would distribute the marijuana if House would fly it. In either April, May or July 1976, these three met again in Phoenix with Boyle and an associate and planned their first smuggling transaction. As planned, House flew to Mexico where, in Santa Ana, Sonora, marijuana was procured on credit from Memo, a Mexican supplier whom House knew from prior drug smuggling flights and had suggested. House flew the marijuana from an airstrip located on Memo's or his friend's property back to an abandoned airstrip at Three Peaks near Phoenix where he was met by Boyle and his associate. The three men transferred the marijuana from the plane to a camper truck which was then driven by Boyle and his associate to Portland. House, after returning the plane to Phoenix, rode with Guido and Rowland to Portland where the marijuana was distributed. Later, House, Guido and Rowland returned to Mexico to pay Memo.

A second, comparable transaction was executed in August or September 1976. Thereafter, House withdrew from the conspiracy and the conspirators hired another pilot, known only as "John," to transport marijuana into Arizona from Mexico. John flew three or four flights for Guido, Rowland and Boyle and smuggled about 4000 pounds of marijuana into the United States. He too obtained the marijuana from Memo and distributed it through Boyle, though landing at a different airstrip near Phoenix, Arizona. Because of monetary problems, John withdrew from the conspiracy after his last flight at the end of October or the beginning of November 1976. At that time or shortly thereafter, Rowland also withdrew from the conspiracy but remained friendly in particular with Guido and was apprised by the conspirators of their continuing smuggling operation.

## The California Indictment

The facts underlying this indictment were revealed in government reports of the Drug Enforcement Administration (DEA) investigation of defendants in California. At about the time that Rowland withdrew from the conspiracy, in late November or early December 1976, an informant for the DEA was approached by Charles Emerett who at the time was seeking a pilot to fly plane loads of marijuana into the United States. When the informant next saw Emerett in March 1977, he renewed his desire to find a pilot. Thereafter, on April 20, 1977, in Fresno, California, the informant introduced Emerett to James Plaven, an undercover DEA agent posing as a pilot. Emerett then advised Plaven that he was associated with two other people from Phoenix (subsequently determined to be Guido and Boyle) and could arrange for marijuana to be available in Mexico. Emerett told Plaven that he sought to hire him as a replacement for a pilot with whom there were disagreements over money and that, in numerous trips over the preceding year, marijuana had been smuggled into the United States near Phoenix and then transported north to Fresno and on to Portland for distribution. In San Diego, on May 2, 1977, Plaven met with Guido and Boyle. Plaven learned that marijuana would be

procured from a Mexican in Santa Ana, Sonora, and flown from an airstrip located on the source's property there to an abandoned airstrip north of Phoenix where Boyle and another person would meet him with a camper truck. Guido told Plaven he had made two previous pilots rich in approximately eleven trips and that if the first trip was successful, the venture would continue with Plaven making weekly flights. As a result of these conversations, on May 11, 1977, Plaven, along with another undercover agent, flew to Phoenix, Arizona to meet with the defendants. Soon after the meeting, Guido and Boyle were arrested.

### Prosecutorial Background

Government documents and testimony of the Arizona DEA agent on the motion to dismiss the indictment disclosed that on April 15, 1977, House was interviewed by DEA agents in Tucson concerning, among other things, his involvement with Guido and Boyle. At that time, he gave a 40-page statement which implicated, among others, Guido and Boyle in drug smuggling. Shortly thereafter, House appeared before the grand jury in the District of Arizona and testified as to his criminal association with Guido and Boyle from March 1976 through September 1976. In May 1977, the DEA agent in Arizona conferred with Plaven regarding his undercover investigation of Guido and Boyle. The agent received from Plaven a personal history report on the defendants and a photograph, but did not request further reports because he could see no connection between the California investigation and his Arizona investigation of a conspiracy. On May 17, 1977, Guido, Boyle and Emerett were indicted in the Eastern District of California and charged with a conspiracy from on or about April 29, 1977 up to and including May 12, 1977, to import marijuana into California and elsewhere in violation of 21 U.S.C. § 963. A month later, on June 27, 1977, the Assistant United States Attorney who was prosecuting the defendants in California sent a copy of that indictment to the Assistant United States Attorney in Arizona, identifying at the same time the attorneys representing the defendants in California. Thereafter, in December 1977 and January 1978, Guido and Boyle entered pleas of guilty to the charge in California and were sentenced to terms of 18 months and 3 months respectively.

It was not until May 2, 1978, that one Guillermo Jesus Lugan-Sainz (also known as Memo) and the defendants, Guido and Boyle, were indicted in Arizona. As noted above, they were then charged with a conspiracy from on or about March 1, 1976 until on or about November 15, 1976 in the District of Arizona and elsewhere, in Count I, to import marijuana in violation of 21 U.S.C. § 963 and, in Count II, to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846. Defendants moved to dismiss the indictment on double jeopardy and due process grounds and the government countermoved to dismiss Count I of the indictment. Judge Craig granted the government's motion but denied defendants' motion to dismiss after a pretrial hearing and also after trial. Guido and Boyle were tried without a jury and convicted of Count II. Guido was sentenced to a term of 5 months, a special parole term of 4 years, and a fine of $1,000 and Boyle was sentenced to a term of 3 years.

### DISCUSSION

Before the district court, defendants argued that the conspiracy charged in Arizona was the same conspiracy to which they pled guilty in the Eastern District of California and that accordingly the indictment should be dismissed. The district court found otherwise, stating that there were two separate crimes arising out of two separate conspiracies at different times and with different participants. The government contends that the standard of review on this appeal is the "clearly erroneous" standard relative to facts found by the trial court and since the holding was not clearly erroneous, the convictions must stand. We do not agree. The standard here applicable is solely one of law because the facts are undisputed. *Gay Lib v. University of Mis-*

*souri*, 558 F.2d 848, 853–54 n. 10 (8th Cir. 1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789 (1978); *S. E. C. v. Spectrum, Ltd.*, 489 F.2d 535, 540 (2d Cir. 1973); *United States v. Kavanagh*, 308 F.2d 824, 828 (8th Cir. 1962); *Stevenot v. Norberg*, 210 F.2d 615, 619 (9th Cir. 1954).

■ In finding separate conspiracies, the district court relied on differences in the participants, the time, and the purposes. It is clear, however, that Guido and Boyle were the key participants in the agreements alleged in both indictments. From the inception of the conspiracy in March 1976, Boyle was Guido's contact in Oregon. Thereafter, Guido and Boyle continued, as masterminds and as the operational core of an ongoing conspiracy, to act together to distribute smuggled marijuana. The conspiracy was not, therefore, terminated by the mere change in pilots nor by the withdrawal of Rowland and the apparent enlistment of Emerett. *United States v. Stromberg*, 268 F.2d 256, 263–64 (2d Cir.), *cert. denied*, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959); *United States v. Bryant*, 364 F.2d 598, 603 (4th Cir. 1966); *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir. 1969).

Nor is the period of time between the alleged termination of the Arizona conspiracy on November 15, 1976, and the alleged beginning of the California conspiracy on April 2, 1977, persuasive. *See Braverman v. United States*, 317 U.S. 49, 52, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942). Contrary to the government's contentions, a lapse in or termination of the conspiracy cannot be inferred simply from an apparent lull in drug deliveries. Emerett sought a replacement pilot first in November or December 1976 and then again in April 1977. With the assistance of a government informant, he enlisted agent Plaven. Thus, there was but one ongoing conspiracy that, as Plaven was told when he was recruited to replace a previous pilot, had been successful in using the proposed method of importation and distribution.

Nor did the purposes of the alleged conspiracies differ. The California indictment charged Guido and Boyle merely with conspiracy to import marijuana but the parties clearly conspired as well to distribute any marijuana successfully smuggled by Plaven. The Arizona indictment charged both conspiracy to possess with intent to distribute and conspiracy to import marijuana. The government's deliberate dismissal of the importation count after defendants moved to dismiss the indictment cannot change the fact that the purpose of the alleged Arizona conspiracy was to import as well as to distribute marijuana.

To summarize, the conspiracies alleged in both indictments involved the same objectives (to import and distribute large quantities of marijuana), the same key participants (Guido and Boyle), the same source (Memo, who apparently fits the description given Plaven of the Mexican supplier in Santa Ana), the same means (a small private plane and camper truck), the same place of importation (Arizona airstrips), the same distribution points (Portland), and one period of time (1976–1977). Thus, it is hard to escape the conclusion that the conspiracies alleged in the California and Arizona indictments were in fact a single continuing conspiracy. *United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Tercero*, 580 F.2d 312 (8th Cir. 1978).

■ Here, the defendants were prosecuted twice for the same conspiracy due to the failure of the Arizona prosecutor to evaluate properly the prior California indictment. Guido and Boyle raise double jeopardy and due process claims, but we need not rely upon these constitutional safeguards since, under our supervisory power of the administration of criminal justice, the court has the authority to correct such unfairness. *See generally McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *Delaney v. United States*, 199 F.2d 107 (1st Cir. 1952); Alfred Hill, *The Bill of Rights and the Supervisory Power*, 69 Colum.L.Rev. 181 (1969); Note, *The Judge-Made Supervisory Power of the Federal*

*Courts*, 53 Geo.L.Rev. 1050 (1965). The fact that the period covered by the conspiracy can be divided into two successive periods does not justify bifurcation into two conspiracies. Fragmentary prosecution resulting from such division must be prohibited. *See United States v. Jacobson*, 547 F.2d 21, 23 (2d Cir. 1976), *cert. denied*, 430 U.S. 946, 97 S.Ct. 1581, 51 L.Ed.2d 793 (1977). Before he filed the indictment in May 1978, there was available to the Arizona prosecutor the statement of Gordon House, his grand jury testimony, and the results of Plaven's investigation. As above noted, he had also received a copy of the California indictment. These facts should have been sufficient notice to the Arizona prosecutor that the indictment he was about to file covered only a different period arising out of the same single conspiracy for which the defendants had theretofore pled guilty in California. In order to maintain the integrity of our judicial process, we have the supervisory authority to avoid and reverse the unjust result arising from two prosecutions for the same offense.

REVERSED.