**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Nelson GUZMAN, Defendant–Appellant.**

**No. 87–5050.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1988.

Decided July 22, 1988.

Joseph D. Allen, Santa Barbara, Cal., for defendant-appellant.

John S. Gordon, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before PREGERSON, BOOCHEVER and THOMPSON, Circuit Judges.

BOOCHEVER, Circuit Judge:

Nelson Guzman appeals his conviction for conspiracy to manufacture, distribute, and possess cocaine with intent to distribute, aiding and abetting an attempt to manufacture cocaine, and aiding and abetting possession of cocaine with intent to distribute. He alleges that the conspiracy count subjected him to double jeopardy, based on his conviction in an earlier trial for conspiracy to possess cocaine with intent to distribute; that evidence seized in a search of his apartment should have been suppressed because his wife did not have apparent authority to consent to the search; and that the deportation of a material witness deprived him of a fair trial. We affirm.

## FACTS

In November 1984, Henry Turley, a rancher in Tuolumne County in rural eastern California, entered into a conspiracy with numerous Colombian nationals to manufacture and distribute cocaine. Turley offered his ranch as a lab site to process 500 kilograms of cocaine base into cocaine hydrochloride. Guzman and another member of the conspiracy delivered forty drums of ether to the ranch in early June 1985. In mid-July, accompanied by yet another conspirator, Guzman delivered additional lab supplies to the ranch. In late July, Guzman went to Turley's ranch to prepare the lab with a third conspirator.

In August, Guzman delivered ten drums of acetone to the ranch, scanning the drums with a "bug detector," a device to detect transmitters. Later that month he drove forty more drums of acetone to Merced, California, where he met with Turley and unloaded thirty of the drums in a barn on a ranch belonging to a friend of Turley's. A bag of trash later discovered in the barn contained garbage from Turley's lab; two items carried Guzman's fingerprints. Guzman and Turley then brought the remaining ten drums to Turley's ranch.

In early September 1985, Guzman delivered seven five-gallon containers of hydrochloric acid to Turley. On September 4, Guzman and Jesus Lopez drove to the ranch with fifteen kilograms of cocaine base. The next morning, Guzman, Turley, and Lopez began to process the cocaine base. Law enforcement agents raided the ranch on the afternoon of September 5; Guzman and Turley escaped, but Lopez was captured.

Inside the lab, the agents found cocaine, cocaine base, forty drums of ether, twenty drums of acetone, seven five-gallon containers of hydrochloric acid, and supplies and equipment for converting cocaine base. In the loft above the lab agents found a driver's license for "Nelson Kuzman," with Guzman's birth date and a former address.

Guzman was arrested in March 1986 on charges of conspiracy to possess cocaine with intent to distribute related to a transaction in Los Angeles on December 6, 1985. We affirmed his conviction on those charges in *United States v. Guzman*, 849 F.2d 447 (9th Cir.1988) (*Guzman I*). Turley, who was arrested earlier in March, later saw Guzman in prison and identified him as the "Nelson Kuzman" involved in the Tuolumne conspiracy. A second superseding indictment charged Guzman with one count of conspiracy to manufacture, distribute, and possess cocaine with intent to distribute, 21 U.S.C. §§ 846 and 841(a)(1) (1982); one count of aiding and abetting an attempt to manufacture cocaine, *id.* and 18 U.S.C. § 2 (1982); and one count of aiding and abetting an attempt to possess cocaine with intent to distribute, *id.*

Before trial, Guzman moved to dismiss Count One of the indictment on double jeopardy grounds and to suppress evidence seized from his apartment. He joined in another defendant's motion to dismiss the indictment because the government had deported a material witness. Following a hearing, the district court denied all three motions. After a bench trial, Guzman was convicted on Count One and sentenced to ten years. A jury convicted him on Counts Two and Three, and he was sentenced to ten and five years respectively. The sentences were ordered to run concurrently with one another and with the ten-year sentence imposed for Guzman's earlier conviction for conspiracy to possess cocaine with intent to distribute in *Guzman I*.

## DISCUSSION

1. *Did the district court err in denying Guzman's motion to dismiss Count One of the indictment on double jeopardy grounds?*

■ Guzman claims that the conspiracy charged in Count One of the indictment embraces the conspiracy for which he was convicted in *Guzman I*, thereby violating the constitutional prohibition against double jeopardy and requiring a reversal of his conviction on Count One. It is Guzman's burden to show that the two conspiracies are the same. *United States v. Bendis*, 681 F.2d 561, 564 (9th Cir.1981), *cert. denied*, 459 U.S. 973, 103 S.Ct. 306, 74 L.Ed. 2d 286 (1982). We review the district court's decision de novo, *United States v. Guido*, 597 F.2d 194, 197 (9th Cir.1979) (per curiam), viewing the evidence in the light most favorable to the prevailing party in the district court, here the government. *United States v. Lewis*, 833 F.2d 1380, 1382 (9th Cir.1987). The facts of *Guzman I* are set out in our earlier opinion, 849 F.2d 447, 448–49 (9th Cir.1988).

■ The double jeopardy clause precludes the government from dividing a single conspiracy into multiple charges and pursuing successive prosecutions against

the defendant. *United States v. Vaughan,* 715 F.2d 1373, 1375 (9th Cir.1983). To sustain his claim of double jeopardy, Guzman must show that the two conspiracies are indistinguishable in law and in fact. *Id.* at 1376. A single conspiracy exists where there is one overall agreement to perform a variety of functions to achieve the objectives of the conspiracy, and may include subgroups or subagreements. *United States v. Patterson,* 819 F.2d 1495, 1502 (9th Cir.1987).

This circuit has adopted a "factor analysis" to determine whether two conspiracy counts charging violation of the same statute charge the same offense and so place the defendant in double jeopardy. *Bendis,* 681 F.2d at 565. " 'We compare[ ] the differences in the periods of time covered by the alleged conspiracies, the places where the conspiracies were alleged to occur, the persons charged as co-conspirators, the overt acts alleged to have been committed, and the statutes alleged to have been violated.' " *Id.* (quoting *United States v. Mayo,* 646 F.2d 369, 372 (9th Cir.) (per curiam), *cert. denied,* 454 U.S. 1127, 102 S.Ct. 979, 71 L.Ed.2d 115 (1981)).

■■■ *Time period.* In *Guzman I,* the first superseding indictment charged a conspiracy "[b]eginning on a date unknown to the Grand Jury and continuing to on or about December 6, 1985." The second superseding indictment in this case charged a conspiracy "[b]eginning on a date unknown and continuing to on or about September 5, 1985." Guzman alleges that because *Guzman I's* conspiracy began on a "date unknown" it encompasses the earlier conspiracy charged in this case. The time period of a conspiracy is determined not by the dates alleged in the indictment, but by the evidence adduced at trial. *See United States v. Lurz,* 666 F.2d 69, 74 & n. 3 (4th Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982). All the overt acts charged and proven in *Guzman I* took place on December 6, 1985. The evidence in this case established that the last overt act of the Tuolumne conspiracy occurred three months earlier, on September 7, 1985. The time periods of the two conspiracies do not overlap.

*Location.* Guzman argues that the conspiracies share the same geography because they both took place in California. The areas of the state involved, however, are quite distinct. The overt acts in *Guzman I* took place in the Orange County city of El Toro and in downtown Los Angeles, California. The conspiracy in this case was centered in Tuolumne County in rural northeastern California, and the surrounding towns of Merced Falls, Sonora, Turlock, Oakdale, and Merced. Some meetings between members of the Tuolumne conspiracy other than Guzman occurred in Glendale, Anaheim, Long Beach, and Westwood, all in southern California. Florida featured in both conspiracies: the tractor-trailer rig in *Guzman I* had Florida plates, and some of the chemicals used at the lab in this case came from a Ft. Lauderdale chemical supply company. It nevertheless appears there was very little actual overlap in the locations of the conspiracies. *See Bendis,* 681 F.2d at 568 (even where both conspiracies had "important connections" with Cleveland, Ohio, their scopes implicated different parts of the world).

*Members.* The only two conspirators identified in *Guzman I* were Daniel Serrano and Guzman; the others involved were never identified. In this case, eleven men were identified at trial as being involved in the conspiracy, along with other unidentified men. Guzman contends that because the personnel identified in *Guzman I* are "wholly included" in the conspiracy here, there is a complete overlap between personnel. Yet none of the other nine coconspirators identified in this case was shown to have had any involvement in *Guzman I,* and the roles performed by Guzman and Serrano in the two conspiracies were quite different. In *Guzman I,* Guzman and Serrano performed a "car switch" to deliver payment for a large shipment of cocaine, and Serrano drove off with the drugs. In this case, Serrano helped to set up the lab, and Guzman transported chemicals, equipment, and cocaine base to the lab, and served as a "cook" to process the drug. The involvement of Guzman and Serrano

does not compel a finding that a single conspiracy existed. *See Bendis*, 681 F.2d at 568 (where grouping of coconspirators varies significantly, no double jeopardy violation); *United States v. Richardson*, 588 F.2d 1235, 1241 (9th Cir.1978) (two conspiracy counts alleging the same overt acts and identical coconspirators do not establish the same conspiracy as a matter of law), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

*Overt acts.* Guzman admits that the overt acts proven in *Guzman I* and in this case are entirely distinct.

*Statutes violated.* In both *Guzman I* and this case, the objective of the conspiracies was to violate 21 U.S.C. § 841(a)(1), which makes it unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." The goals of the two conspiracies, however, were not identical. In *Guzman I* the goal was to possess a large shipment of cocaine from Florida and to distribute it. This case involves a complex scheme to set up a cocaine processing lab to manufacture cocaine from cocaine base for later distribution.

No single factor in the above analysis controls the determination of whether there was a single conspiracy; after consideration of all, the question is whether there was more than one agreement. *Bendis*, 681 F.2d at 568. We conclude that the two conspiracies were separate. Almost all the factors analyzed suggest that the conspiracies were not the same. Guzman characterizes *Guzman I* as "simply further efforts by the conspirators [in this case] to recoup their fortunes, and continue their enterprise." He points to no evidence, however, that any other member of the Tuolumne conspiracy was involved in any way. Further, even if Guzman were in financial straits at least in part because of the raid of the lab, and conspired with Serrano to import cocaine from Florida to "recoup [his] fortunes," this would not make the December 6, 1985 conspiracy identical with the earlier one. "The fact that there is some interrelationship between conspiracies does not necessarily make them the same criminal enterprise," where one conspiracy involves unlawful transactions "quite distinct in their means of execution and their objects." *United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir.1976) (per curiam).

2. *Did the district court err in denying Guzman's motion to suppress evidence seized from his apartment on the ground that his wife had no apparent authority to consent to the search?*

At trial, the government introduced an electronic "bug detector" seized in a search of Guzman's apartment on Beach Boulevard in Anaheim, California. The warrantless search was performed with the consent of Connie Quintero, Guzman's wife. Guzman claims that her consent was ineffective because he was the main resident of the apartment and she was only an occasional visitor.

Although in the past this court has reviewed the issue of authority to consent to a search for clear error, recent cases have left open whether this mixed question of law and fact is essentially factual or legal, and thus whether clearly erroneous or de novo review is appropriate. *See United States v. Sealey*, 830 F.2d 1028, 1031 (9th Cir.1987); *United States v. Hamilton*, 792 F.2d 837, 841 (9th Cir.1986). In each case we determined that the consent was valid under either standard. We reach the same conclusion here, and need not decide which standard of review to apply.

Consent to search may be obtained from a third party with common authority over the premises, or with some sufficient relationship to the place or effects to be searched. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). The joint user of property has the authority to consent, *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), as does a lessee and resident of a house. *United States v. Salvador*, 740 F.2d 752, 757 (9th Cir.1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985).

Anaheim police officers arrested Guzman when, with Quintero, he attempted to reg-

ister the BMW used in the cocaine transaction in *Guzman I.* Quintero stated that she was married to Guzman, and identified herself as the lessee of the Beach Boulevard apartment which she shared with him on occasion, although her residence was on Rome Street in Anaheim. When an officer went to the Rome Street address to secure it while a warrant was being obtained, Quintero was there and expressed a desire to avoid an obvious police presence outside the house. She suggested that the officers just look inside and said she consented to a search even though the officer made it clear he did not have a warrant. The officer then asked whether she leased the Beach Boulevard apartment and paid the rent; she said yes, and that he also could search that address without a warrant.

After a search of the Rome Street house, during which Quintero was entirely cooperative, she handed the officer a set of keys to the Beach Boulevard apartment but declined to accompany him and the other officers to that apartment. In the subsequent Beach Boulevard search, the officers saw various items of women's clothing in closets and makeup in the bathroom. They also found the bug detector and then a locked leather briefcase in a closet. When called at the Anaheim jail, Guzman refused to give the combination of the briefcase. After the search, the officer returned the keys to Quintero, who said she wanted to remove her things so she could stop paying rent.

The government always bears the burden of proving effective consent. *United States v. Impink,* 728 F.2d 1228, 1232 (9th Cir.1984). It met that burden. Beyond the other evidence of her status as Guzman's wife, and lessee and sometime resident of the apartment, her possession of a key in itself has special significance. *United States v. Gulma,* 563 F.2d 386, 389 (9th Cir.1977). Guzman has produced no evidence that her access to the apartment was limited, and identifies no other factor that might affect her right to consent, such as the presence of a person with a superior privacy interest who actively objects to the consent given. *See Impink,* 728 F.2d at 1234.

Guzman's further objection that the bug detector should have been suppressed because his refusal to provide the combination to the briefcase constituted a revocation of consent must fail. Even if that refusal revoked Quintero's consent, the bug detector was discovered before the briefcase, and evidence found before revocation will not be suppressed. *Jones v. Berry,* 722 F.2d 443, 449 (9th Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2343, 80 L.Ed.2d 817 (1984).

3. *Did the district court err in denying Guzman's motion to dismiss the indictment for alleged deportation of a material witness?*

Guzman alleges that the government deported Jesus Lopez, who Guzman claims would have provided exculpatory testimony. A violation of a defendant's right to compulsory process and to due process will be found if he can make a plausible showing that deportation of a witness deprived him of testimony that would be "both material and favorable to the defense." *United States v. Valenzuela–Bernal,* 458 U.S. 858, 872–73, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982).

Lopez pled guilty to one of three counts pending against him, and received a suspended sentence conditioned on deportation. While he was in INS custody, his immigration bond was posted and he was released, before Turley identified Guzman as the "Nelson Kuzman" charged as a member of the conspiracy. Lopez left the country for Colombia voluntarily, before his deportation proceedings began. He thus was not actually deported. Without resolving whether Lopez was made unavailable by government action, we conclude that Guzman has failed to show a violation of his constitutional rights.

Lopez's statements to the FBI after arrest indicate that his evidence would have incriminated rather than exculpated Guzman. Lopez identified a Colombian he knew as "Pepo" whose physical description and composite drawing resembled Guzman. "Pepo" recruited Lopez and told him he

would be paid $200 per kilogram. Guzman rests his claim that Lopez's testimony would have been favorable to him on a declaration taken from Lopez after he returned to Colombia and filed by another defendant. In his declaration, Lopez stated that Guzman was not part of a conspiracy to process cocaine at Turley's ranch. This statement, made after Lopez left the country, was the first indication that Lopez's testimony might be other than incriminating to Guzman. At the time of Lopez's release, the government could in good faith have determined that Lopez could provide only incriminating testimony related to Guzman. *See Valenzuela–Bernal,* 458 U.S. at 872, 102 S.Ct. at 3449. In addition, the evidence of acts by Guzman before Lopez's first visit to the ranch on September 4 would have been sufficient to support his conviction. *See United States v. Fierros,* 692 F.2d 1291, 1296 (9th Cir.1982), *cert. denied,* 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983).

The district court did not err in denying the motion to dismiss the indictment.

## CONCLUSION

Guzman's conviction is AFFIRMED.