**UNITED STATES of America,**

v.

**James Edward SMITH, Defendant.**

**Crim. No. 90–00071–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 20, 1991.

Roscoe C. Howard, Asst. U.S. Atty., Richmond, Va., for plaintiff.

Brian Gettings, Frank W. Dunham, Jr., and Stewart T. Leeth, Cohen, Gettings, Alper and Dunham, Arlington, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter is before the Court on Defendant James Edward Smith's ("Smith") motion to Dismiss Count I of the indictment and for a further hearing under *Kastigar*. For the reasons discussed below, the Court will GRANT the motion to DISMISS Count I with respect to James Edward Smith, and will DENY the motion for additional hearings under *Kastigar*.

### I. FACTUAL BACKGROUND

On February 6, 1988, Defendant James Edward Smith (a/k/a "Smitty") was arrested in the District of Columbia by federal narcotics agents. On February 8, 1988, Smith entered into a plea agreement with the Office of the United States Attorney for the District of Columbia. The provi-sions of that plea agreement were outlined in a letter addressed to Smith's lawyer, Brian Gettings, dated February 6, 1988. The letter was signed by Assistant United States Attorneys Charles S. Leeper, William J. O'Malley, Jr., and Darryl W. Jackson. Smith signed the letter on February 7, 1988, and Mr. Gettings signed the letter on February 8, 1988.

In the plea agreement, Smith agreed to plead guilty to a conspiracy to distribute narcotics, and to three counts of income tax evasion. Smith also agreed to cooperate fully with "federal law enforcement authorities." Smith was given use and transactional immunity (Paragraph 4(b)), but there was an explicit exception for future crimes. *See* Paragraph 6. Pursuant to the plea agreement, Smith plead guilty on March 16, 1988. On June 3, 1988, Smith was given the maximum sentence on each count, which totalled to a term of thirty-five (35) years.

The Office of the United States Attorney for the Eastern District of Virginia was not involved in the plea agreement. Assistant U.S. Attorney Liam O'Grady wrote Mr. Gettings a letter on April 21, 1988 which offered Smith use immunity in exchange for his full cooperation in prosecuting the Richmond narcotics ring. Although Smith met with state and federal authorities from Virginia on April 28, 1988, those authorities were not pleased with the outcome of that meeting. Mr. O'Grady concluded that Smith provided the investigators with absolutely no new information.

Prior to sentencing, Henry Hudson, the United States Attorney for the Eastern District of Virginia, wrote to the sentencing judge in the District of Columbia. The letter, dated June 2, 1988, complained that Smith had failed to provide useful information about the Richmond heroin distribution scheme. The judge imposed the maximum sentence the following day.

There is considerable evidence that the Eastern District of Virginia and the District of Columbia were involved in a turf war concerning the prosecution of Smith. This disagreement ultimately caused the authorities in the District of Columbia to

order that no information relating to Smith be shared with the Eastern District of Virginia.

On August 20, 1990, a federal grand jury in the Eastern District of Virginia returned an indictment against James Edward Smith, Olivia Bratton, and Richard Leander Smith. Count I of this indictment charges these persons with conspiring to distribute heroin, beginning "on or about February 9, 1988." Essentially, the indictment alleges that, while incarcerated, Smith made plans for the Richmond storage and distribution of narcotics that he had in Washington, D.C. at the time of his arrest. The Government presented testimony from James Reginald Smith ("Skank"), that Smith called Skank soon after Smith's arrest and asked Skank to retrieve certain valuables (which proved to be narcotics) from various apartments in D.C.

Smith claims that Count I is barred by the Double Jeopardy Clause. Further, Smith argues that he is entitled to transactional immunity from prosecution under Count I, since the conspiracy was actually formed prior to the date that he signed the plea agreement. Finally, Smith argues that he is entitled to use immunity for his testimony, and that the Government has not satisfied their burden under *Kastigar* to prove that their evidence is derived from an independent source.

## II. DOUBLE JEOPARDY CLAIM

### A. GENERAL PRINCIPLES

■ The Fifth Amendment provides that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." The Double Jeopardy clause protects Defendants from being forced to undergo the ordeal of a second trial for the same alleged crimes. In order to protect a Defendant's right against *standing trial,* denial of a plausible double jeopardy claim is reviewable on an interlocutory basis. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

The Fourth Circuit has recently considered the proper placement of the burden of proof during a pretrial double jeopardy hearing. *United States v. Ragins,* 840 F.2d 1184 (4th Cir.1988). After reviewing cases in other Circuits, Judge Phillips held that once a Defendant has "made a non-frivolous showing that an indictment charges him with an offense for which he was formerly placed in jeopardy, the burden of establishing that there were two separate crimes shifts to the Government." *Ragins,* 840 F.2d at 1192. On remand, the district court dismissed the conspiracy count. *United States v. Ragins,* 702 F.Supp. 1249, 1253 (D.S.C.1988).

The Fourth Circuit requires the Government to prove the existence of two separate agreements by a "preponderance of the evidence." *Ragins,* 840 F.2d at 1192.

### B. SPECIAL DOUBLE JEOPARDY RULE FOR CONSPIRACY

The Fourth Circuit has noted that double jeopardy issues require special attention in conspiracy cases. *Id.* at 1188. After discussing the usual rule that a claim is barred by double jeopardy if the prosecution will present the "same evidence" at the second trial, the *Ragins* Court concluded that conspiracy cases required an "even more flexible test." *Id.* After recognizing that the essence of conspiracy is an agreement to commit unlawful acts, Judge Phillips cited *United States v. MacDougall,* 790 F.2d 1135, 1144 (4th Cir.1986) for the proper test to distinguish one conspiracy from several.

Under *MacDougall,* this Court will look to five factors to determine if the conspiracy alleged in Count I is the same conspiracy to which Smith plead guilty in 1988. These factors are:

1) The time period covered,
2) Place where the conspiracy operated,
3) Persons involved,
4) Overt acts alleged, and
5) Substantive statutes violated.

### C. THERE WAS ONLY ONE SMITH GANG NARCOTICS CONSPIRACY

The evidence establishes that Defendant Smith was a continual member of one large narcotics conspiracy, not two separate ones. Artful pleading by the Government will not dictate the scope of the conspiracy,

rather the Court will look to the underlying reality. *Ragins*, 840 F.2d at 1190; *Short v. United States*, 91 F.2d 614, 624 (4th Cir. 1937).

■ The 1988 indictment covered a time period from 1979 to 1988. Although the 1990 indictment alleges a starting date of February 9, 1988, there is substantial evidence that members of the Smith family had been involved in narcotics distribution in Richmond for decades. The overt acts alleged in the second conspiracy, involved moving drugs from Washington to storage in Virginia. These acts were merely steps in furtherance of the distribution scheme alleged in the 1988 indictment. When conspiracies share the same objectives, they are typically the same conspiracy. *See United States v. Kalish*, 690 F.2d 1144, 1151 (5th Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).

The 1988 indictment, to which Smith plead guilty, simply alleged a conspiracy to distribute narcotics, without geographic limitation. In fact, the evidentiary hearing established that at least one D.C. investigator knew that Washington was the source for cocaine and heroin destined for Richmond. Indeed, the Richmond heroin was actually cut in Washington, D.C. *See* Testimony of Barbara Hampton. Both indictments involve narcotics in both Washington and Virginia.

■ The participants of the two conspiracies were largely the same. For example, the 302 Form concerning Excell Alexander indicates that he was part of the "first" conspiracy. He also knew about "Skank", "Peaches", and "Peter"; all members of the "second" conspiracy. Alexander knew about Smith's dealings with Gay Caviness, the critical figure in the "first" conspiracy. The plea agreement signed by Smith in the "first" conspiracy mentions Olivia Bratton, a central figure in the "second" conspiracy. Of course, Smith himself was a central figure in both conspiracies. This similarity in personnel is sufficient to suggest that the two conspiracies are one and the same. There is no requirement that all the participants be identical. *United States v. Mallah*, 503 F.2d 971 (2d Cir.1974).

The Government argues that the two conspiracies are temporally separate, but the evidence does not support this claim. Rather, the evidence suggests that Smith and James Reginald Smith ("Skank") had conspired to distribute drugs in Richmond prior to Smith's arrest. Moreover, there is no evidence that the "first" conspiracy came to a halt with Smith's arrest. In the absence of such evidence, the law presumes that a conspiracy continues after the arrest of a participant. *United States v. West*, 877 F.2d 281, 289 (4th Cir.1989). On this point, the Court finds it significant that U.S. Attorney Hudson stated in a March 25, 1990 letter to Judge Green that Smith "left intact" a heroin and cocaine distribution ring. The Court finds that there was a single conspiracy which spanned the entire relevant time frame.

The Court is not persuaded by the contention that Smith's capture required a "new" conspiracy to store the drugs. An instructive case is *United States v. Perkins*, 503 F.Supp. 1107 (S.D.Tex.1980), which involved a conspiracy to commit mail and wire fraud. The Defendant was acquitted by a jury, and later charged with additional acts of fraud commencing after the dates alleged in the first indictment. The court held that double jeopardy barred the prosecution, since the modus operandi was essentially the same that had been alleged in the prior charge.

Courts have generally viewed conspiracies to traffic drugs as the continuing sort. "[T]he day to day operations of buying, transporting, and selling are handled without the necessity of renewing the underlying consensual agreement." *United States v. Ruigomez*, 576 F.2d 1149, 1151 (5th Cir. 1978); *United States v. Gonzalez*, 491 F.2d 1202, 1206 (5th Cir.1974). In *Ruigomez*, the Fifth Circuit rejected the Government's argument that using a plane instead of a car, using a new storage place, and other changes created a new conspiracy. Instead, the court found that the common goal of importing marijuana was met in different ways, and that there was simply one over-riding conspiracy.

The extant case is similar to that presented in *United States v. Mallah*, 503 F.2d 971, 987 (2d Cir.1974), *cert. denied* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975). In *Mallah* the court compared the various acts and time periods alleged, and concluded that there was one narcotics conspiracy. The Second Circuit noted that "the *task of defining the scope of these [narcotics] conspiracies is somewhat akin to describing an elephant from touch*" (emphasis added). The court therefore dismissed the second indictment on Double Jeopardy grounds.

Other Circuits have held that drug conspiracies were single entities, despite differences in time or participants. *See United States v. Guido*, 597 F.2d 194 (9th Cir. 1979) (same marijuana mastermind in both indictments); *United States v. Tercero*, 580 F.2d 312 (8th Cir.1978) (large quantity of drugs and same source).

James Edward Smith's alleged phone call to Skank was an effort to preserve a stash of drugs obtained as part of his overall drug distribution scheme. He turned to Skank because he had dealt with him before. This action was part of the daily operation of the Smith drug ring. If the Government had brought a multiple conspiracy indictment against Smith which alleged separate conspiracies to distribute cocaine in D.C., and heroin in Virginia, these charges would have been consolidated into a single conspiracy count. *United States v. Guzman*, 852 F.2d 1117 (9th Cir.1988). This analysis remains valid here, despite the different procedural posture.

Looking to the five *MacDougall* factors, and considering the totality of the circumstances presented, the Court concludes that the Government has failed to prove by a preponderance of the evidence that Smith was involved in two separate and independent conspiracies.

D. WITHDRAWAL

Perhaps realizing that only one conspiracy is involved, the Government also argues that Smith withdrew from the narcotics conspiracy by pleading guilty. The Government contends that Smith then rejoined this conspiracy two days later, when he made the phone call to Skank. While this approach has some appeal, no case law supports the Government's position.

The Court has found no instances where rejoining a conspiracy has been prosecuted *as a separate offense*, nor has the Government cited any authority for this proposition. In fact, review of the relevant cases confirms that rejoinder does not constitute a new offense, but simply vitiates the defense of withdrawal. The conspiracy, because it is an *agreement* to violate the law, is a single violation. Once an overt act has been committed, criminal liability attaches. Withdrawal does not remove liability for either the agreement itself, or the previous acts of co-conspirators in pursuit of the conspiracy. *United States v. Hickey*, 360 F.2d 127 (7th Cir.), *cert. denied* 385 U.S. 928, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966).

Additionally, the case law on withdrawal suggests that Smith never really withdrew. Courts considering the withdrawal defense require that the withdrawal be complete, and in good faith. *United States v. Dorn*, 561 F.2d 1252, 1256 (7th Cir.1977). Clearly, any withdrawal effected by the plea agreement was not in good faith, since two days later Smith was allegedly on the phone with Skank. Furthermore, Smith's actions signalled to Skank that Smith remained a member of the conspiracy.

The District Court for the Southern District of New York considered a similar situation in *United States v. Castellano*, 610 F.Supp. 1359, 1419 (S.D.N.Y.1985). There, the Government conceded that the conspiracy alleged in a prior prosecution (which led to conviction) was the same as alleged in the current prosecution. The Government argued that the Defendant "continued in" or "rejoined" the conspiracy, and therefore could not claim a double jeopardy bar. Although the court confusingly held that withdrawal barred prosecution, the court noted that "The Double Jeopardy clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Id.* at 1419. (citing *United States v.*

*Brown*, 432 U.S. 161, at 169, 97 S.Ct. 2221, at 2227, 53 L.Ed.2d 187 (1977)). This reasoning applies here. Once a Defendant has been punished for entering into a conspiracy, he cannot be punished again for rejoining the same conspiracy.

The Government contends that a ruling in Smith's favor will encourage Defendants to continue their criminal activity after pleading guilty. This argument is unpersuasive. Smith remains fully culpable for all *substantive* crimes he commits after entering his guilty plea. The conspiracy count is different. Conspiracy is punished because society recognizes the danger of criminal agreements. Smith has already been convicted for entering into an agreement to distribute narcotics, and he has been punished. This agreement became criminal after the drug ring's first overt act. Smith's efforts to safeguard his drug stash after arrest are properly viewed as a subset of that continuing conspiracy. Smith should not again be tried for conspiring to distribute narcotics.

### E. CONCLUSION

For these reasons, the Court will GRANT Defendant Smith's motion to DISMISS Count I of the Indictment with respect to James Edward Smith, on the ground that it violates the Double Jeopardy clause of the Fifth Amendment.

### III. TRANSACTIONAL IMMUNITY

The Court's disposition of Count I on double jeopardy grounds makes it unnecessary to consider the Defendant's claim that the plea agreement grants him transactional immunity. The Court does note, however, that because there was only one Smith narcotics conspiracy, the conspiracy alleged in Count I is not a "future" crime. Therefore transactional immunity would appear to apply.

### IV. USE IMMUNITY

#### A. GRANT OF USE IMMUNITY

■ Smith claims that he was granted "use immunity" by both the plea agreement and A.U.S.A. Liam O'Grady's letter of April 21, 1988. Paragraph 6 of the plea agreement provides:

Nothing in this agreement shall be construed to protect Mr. Smith in any way from prosecution for: ... (3) for any offenses committed by him after the date of this agreement. The information and documents that he discloses to the Government pursuant to this agreement may be used against him in any such prosecution.

Although this language clearly eliminates any use immunity for future crimes, the Defendant argues that this language is inconsistent with the grant of immunity in Paragraph 4(b) which provides that Smith "will not be charged with any other criminal violations ... that occurred prior to the date of this agreement."

There is no inconsistency. The language of Paragraph 6 is explicit and clear. Smith was given no use immunity for future crimes. Therefore if his cooperation led to discovery of criminal activity by Smith which occurred after February 8, 1988, the plea agreement would not be violated.

■ The Liam O'Grady letter of April 28, 1988 purports to give Smith use immunity, however the letter also requires that Smith "cooperate fully with investigators." Paragraph 1. The testimony presented at the evidentiary hearing, including the testimony of Mr. O'Grady, demonstrated that Smith failed to significantly cooperate with the authorities from the Eastern District of Virginia. In fact, O'Grady stated that Smith provided his office with "no new information." Defendant concedes that he stated that he would not "do" his Richmond friends.

In interpreting a plea agreement or immunity grant, this Court will apply contract law principles and look to the context of the agreement. *See United States v. Quatermain, Drax*, 613 F.2d 38, 40 (3d Cir.), *cert. denied* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). The evidence shows that Smith gave the Eastern District nothing new. Further, the testimony of Skank indicates that Smith had considerable knowledge about Richmond narcotics that he did not share with the authorities.

Smith's failure to cooperate with the authorities in the Eastern District of Virginia

310

voids the grant of use immunity. Certainly, if Smith continued to set up Richmond drug deals as alleged in the indictment, then Smith did not "fully cooperate" as required. Given the testimony at the hearing, and the circumstances of the letter, the Court concludes that Smith is entitled to no "use immunity" based upon the O'Grady letter.

### B. ADEQUACY OF *KASTIGAR* HEARING

■ Even if Smith is entitled to use immunity, the Court finds that the Government has satisfied its burden under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). The Government has amply demonstrated that the Eastern District was isolated from information obtained in the District of Columbia. Further, the Government established an independent basis for the wiretap which led to the indictment of Skank and the discovery of the materials in the locker. *See* Affidavit in support of Wiretap; Testimony of Sgt. Carney. The testimony and proffers of the members of the drug task force establish that their investigation was conducted independently. The Government has satisfactorily shown "an independent, legitimate source for the disputed evidence." *Kastigar* at 460, 92 S.Ct. at 1664–65.

The Government clearly demonstrated both that Smith provided no useful information, and that the Government's evidence in this case stems from independent sources. Therefor the Government has satisfied its burden under *Kastigar*.

### C. CONCLUSION

For these reasons, the Court FINDS that Smith was NOT GRANTED USE IMMUNITY by either the plea agreement or the O'Grady letter. In any event, the Court also FINDS that the Government has SATISFIED the requirements of a *Kastigar* hearing if one were required.