UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert I. BENDIS, Andrew D'Amato, Armand Mucci, Defendants-Appellants.

Nos. 80–1301, 80–1302 and 80–1310.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1981.

Decided Sept. 15, 1981.

As Amended May 24, 1982.

Rehearing and Rehearing En Banc
Denied June 1, 1982.

Certiorari Denied Nov. 1, 1982.
See 103 S.Ct. 306.

William C. McCorriston, Goodsill, Anderson & Quinn, Honolulu, Hawaii, for Bendis.

William Sandkuhler, III, Honolulu, Hawaii, for D'Amato.

Peter C. Wolff, Hart & Wolff, Honolulu, Hawaii, for Mucci.

William C. Bryson, Dept. of Justice, Washington, D. C. (argued), for plaintiff-appellee; Daniel A. Bent, Asst. U. S. Atty., Honolulu, Hawaii, on brief.

Before GOODWIN, HUG and POOLE, Circuit Judges.

POOLE, Circuit Judge:

These are interlocutory appeals from the orders of the district court denying appellants' motions to dismiss an indictment returned against them in the District of Hawaii. Appellants contend that the Hawaii indictment is barred by the Double Jeopardy Clause of the Fifth Amendment, is the product of vindictive prosecution and should be dismissed due to delay and allegedly improper introduction of evidence before the grand jury. We have jurisdiction only as to the double jeopardy and vindictive prosecution claims. *See Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (double jeopardy); *United States v. Griffin*, 617 F.2d 1342 (9th Cir.), *cert. denied*, 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980), (vindictive prosecution). We affirm the district court orders refusing to dismiss the indictment on these bases and dismiss the appeal in all other respects for want of jurisdiction.

I

On January 14, 1980, a five-count indictment was returned in the District of Hawaii

charging appellants and Mark Iuteri[1] as follows: Count One charges a conspiracy between March 2 and May 2, 1977 to cause interstate travel and use of wire communication in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 371 (the substantive statutory offenses are 18 U.S.C. §§ 1343, 2314); Count Two charges appellants with using wire communication in furtherance of a scheme to defraud Hawaii building contractor Michael Leong, in violation of 18 U.S.C. §§ 1343, 2; Count Three charges appellants with inducing interstate travel by Leong in furtherance of a scheme to defraud him, in violation of 18 U.S.C. §§ 2314, 2; Count Four charges appellants and Iuteri with inducing interstate travel by James Kealoha in furtherance of a scheme to defraud him, in violation of 18 U.S.C. §§ 2314, 2; Count Five charges appellants and Iuteri with transporting in interstate commerce a check for $12,500.00 while knowing the check to have been taken by fraud, in violation of 18 U.S.C. §§ 2314, 2.

Prior to this indictment, appellants, along with Alfredo Proc, Larry Mangiamelli and Phillip Kitzer, were convicted on various charges arising from an indictment returned in the District of Kansas. Each appellant was convicted on count two of that Kansas indictment, which charged a conspiracy from June 6 to 17, 1977 to transport a $110,000.00 money order in commerce, in violation of 18 U.S.C. § 371 (the substantive offense charged is 18 U.S.C. § 2314). Appellants Bendis and Mucci were also convicted on count three of that indictment, which charged unlawful transfer in commerce of a $110,000.00 money order procured by fraud, in violation of 18 U.S.C. § 2314. Two remaining counts of the Kansas indictment did not charge appellants.

On February 22, 1980, appellant D'Amato filed a motion to dismiss the Hawaii indictment as barred by the Double Jeopardy Clause of the Fifth Amendment. He contended that count one of the Hawaii indictment charges the same conspiracy tried in count two of the Kansas indictment.

Shortly thereafter, Bendis filed a similar motion, adding also that the indictment had to be dismissed because of vindictive prosecution, impermissible delay both before and after indictment and improper introduction of evidence before the grand jury. All appellants joined in Bendis' motion.

On April 10, 1980, the district court denied the motions to dismiss on all bases save double jeopardy. Five days later, the court denied the motion to dismiss on double jeopardy grounds. After reviewing the trial transcript from the Kansas proceeding, and a proffer by Hawaii prosecutors of the evidence that they expected to produce at trial, the court concluded that the conspiracy charged in Hawaii was distinct from that tried in Kansas and therefore the Double Jeopardy Clause was not a bar. The court's ruling was without prejudice to the right of the appellants to renew their double jeopardy claim when the actual evidence produced at the Hawaii trial is available for examination.

On motion of appellants, the district court stayed further proceedings to permit interlocutory presentation of the double jeopardy claim to this court.

## II

The Double Jeopardy Clause prohibits subdivision of a single criminal conspiracy into multiple violations of one conspiracy statute. *Braverman v. United States*, 317 U.S. 49, 52–53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942). To sustain a double jeopardy claim, the Hawaii prosecution under count one must be indistinguishable "in law and fact" from the Kansas conspiracy charge. *Gavieres v. United States*, 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489 (1911); *United States v. Burkett*, 612 F.2d 449, 451 (9th Cir. 1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 853 (1980). Both counts charge conspiracies under the general federal conspiracy statute, 18 U.S.C. § 371.

---

1. Iuteri is not a party to this appeal. He was tried, convicted and his conviction affirmed by this court in an unpublished memorandum.

## A.

This circuit has held that it is appellants' burden to establish that two conspiracies charged are the same. *See Sanchez v. United States*, 341 F.2d 225, 227 (9th Cir.), *cert. denied*, 382 U.S. 856, 86 S.Ct. 109, 15 L.Ed.2d 94 (1965). But the nature of the appellant's burden is necessarily different in this interlocutory appeal. The second trial has not yet occurred and the government is in the better position to know what it expects to prove at that trial. *Sanchez* did not have to consider this problem because it arose after the second trial was completed.

■ The Second, Third and Fifth Circuits hold that in an *Abney* appeal such as this, when a defendant puts double jeopardy in issue with a non-frivolous showing that an indictment charges the same offense as that for which he was formerly placed in jeopardy, the "burden of proof" [2] or "burden of persuasion" [3] is on the government to establish by a preponderance of the evidence separate conspiracies. As an evidentiary concept, the burden of persuasion generally does not shift and would appear to rest always with the defendant on a double jeopardy claim. *See* J. Wigmore, *Evidence* § 2489, p. 285 (3d ed. 1940); *Sanchez v. United States, supra*, 341 F.2d at 227 (burden is on defendant to establish double jeopardy). But we agree with the principle in these cases that once the defendant makes a non-frivolous showing of former jeopardy, the government must tender to the court evidence indicating that separate conspiracies are charged. While this appears more properly characterized as a burden to go forward with the evidence, it may in practical effect amount to a burden to persuade the court. In this case, the government assumed its burden to go forward.

## B.

■ The primary constitutional test used to determine whether two counts in the same or subsequent indictments charge the same offense is the "same evidence" or "*Blockburger*" test, developed in the early Supreme Court cases of *Gavieres v. United States, supra*, 220 U.S. at 342, 31 S.Ct. at 422, and *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). *See Illinois v. Vitale*, 447 U.S. 410, 415–16, 100 S.Ct. 2260, 2264–65, 65 L.Ed.2d 228 (1980); *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977). This test analyzes the essential elements of the crimes charged in the two counts. "If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes. . . ." *Brown v. Ohio, supra*, 432 U.S. at 166, 97 S.Ct. at 2226, *quoting, Iannelli v. United States*, 420 U.S. 770, 785 n.17, 95 S.Ct. 1284, 1293 n.17, 43 L.Ed.2d 616 (1976).

■ Providing the double jeopardy protection recognized in *Braverman* presents a peculiar problem and requires application of a different test. The essence of the crime of conspiracy is the agreement to commit unlawful acts. *Iannelli v. United States, supra*, 420 U.S. at 777, 95 S.Ct. at 1289. *Braverman* instructs that when there is only one agreement, there is only one violation of the general federal conspiracy statute. 317 U.S. at 52–53, 63 S.Ct. at 101. This remains true even though the conspiratorial agreement may encompass diverse criminal objectives which would violate several statutes. *Id. Blockburger* analyzes similarities or distinctions in the proof the government must offer to obtain convictions on multiple counts. Yet strict, uncritical application of *Blockburger* to multiple conspiracy charges under the same statute could result in no double jeopardy protec-

---

**2.** *United States v. Inmon*, 568 F.2d 326, 331 (3d Cir. 1977); *United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *accord, United States v. Castro*, 629 F.2d 456, 466 (7th Cir. 1980) (Fairchild, C. J., concurring)."

**3.** *United States v. Stricklin*, 591 F.2d 1112, 1124 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979).

tion at all for defendants so charged. Minor variations in the overt acts charged in the separate counts, or in the underlying objects allegedly embraced in the conspiracy, might facially satisfy *Blockburger*. *See generally United States v. Tercero*, 580 F.2d 312 (8th Cir. 1978); *United States v. Marable*, 578 F.2d 151 (5th Cir. 1978); *Short v. United States*, 91 F.2d 614 (4th Cir. 1937). Across the board application of *Blockburger* would sanction artful crafting of conspiracy charges which could permit the government to subdivide one criminal conspiracy into multiple violations of a single statute, a result which *Braverman* forbids.

■ Because of the functional inadequacy of the *Blockburger* test when applied to multiple counts under the same conspiracy statute, this circuit and most others have adopted a "factor analysis" to determine whether two conspiracy counts under one statute charge the "same offense." [4] This factor analysis was first enunciated in this circuit in *Arnold v. United States*, 336 F.2d 347, 350 (9th Cir. 1964), *cert. denied*, 380

U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965).

We compare[ ] the differences in the periods of time covered by the alleged conspiracies, the places where the conspiracies were alleged to occur, the persons charged as co-conspirators, the overt acts alleged to have been committed, and the statutes alleged to have been violated. *United States v. Mayo*, 646 F.2d 369, 372 (9th Cir. 1981) (per curiam), *citing, Arnold v. United States, supra; accord, Rogers v. United States*, 609 F.2d 1315, 1317–18 (9th Cir. 1979); *United States v. Westover*, 511 F.2d 1154 (9th Cir.), *cert. denied*, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 673 (1975); *Sanchez v. United States, supra*, 341 F.2d at 227.[5]

## C.

While *Arnold* and related cases state the appropriate legal test, it remains to be determined what standard of review shall apply to this interlocutory appeal. The Hawaii trial has not been completed and there is not yet available a trial record reflecting

**4.** In *United States v. Brooklier*, 637 F.2d 620, 623 (9th Cir. 1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1514, 67 L.Ed.2d 815 (1981), this court said "the *Blockburger* test governs all double jeopardy claims save those precisely within the ambit of *Ashe v. Swenson*," 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The court cited the earlier Ninth Circuit cases of *United States v. Solano*, 605 F.2d 1141 (9th Cir. 1979), *cert. denied sub nom., England v. United States*, 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980), and *United States v. Snell*, 592 F.2d 1083 (9th Cir.), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). Although this case is not "precisely within the ambit of *Ashe v. Swenson*," neither *Solano, Snell* nor *Brooklier* requires application of *Blockburger* in this case.

In *Solano, Snell* and *Brooklier*, the government charged violations of different statutes in the second prosecution. The courts have often recognized that subsequent indictments charging violations of different conspiracy statutes present double jeopardy considerations distinct from subsequent charges under the same conspiracy statute. *See, e. g., Sanabria v. United States*, 437 U.S. 54, 70 n.24, 98 S.Ct. 2170, 2182 n.24, 57 L.Ed.2d 43 (1978); *United States v. Burkett*, 612 F.2d 449, 451 (1979); *United States v. Marable*, 578 F.2d 151, 154–55 n.1 (5th Cir. 1978). Charges under distinct conspiracy statutes bring into consideration questions of Congress' broad power to define of-

fenses. *Sanabria v. United States, supra, Jeffers v. United States*, 432 .U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) (plurality opinion). Charges under the same statute implicate the *Braverman* rule against subdividing one conspiracy.

We would be reluctant to read *Solano, Snell* or *Brooklier* as requiring application of *Blockburger* inasmuch as they present factual situations dissimilar to our's and such a reading would be inconsistent with the clear holdings of *Arnold, Mayo* and other Ninth Circuit cases cited in the text.

**5.** Decisions of other circuits consistent with the Ninth Circuit view include: *United States v. Chagra*, 653 F.2d 26 (1st Cir. 1981); *United States v. Tammaro*, 636 F.2d 100 (5th Cir. 1981); *United States v. Stricklin*, 591 F.2d 1112 (5th Cir. 1979); *United States v. Tercero*, 580 F.2d 312 (8th Cir. 1978); *United States v. Marable*, 578 F.2d 151 (5th Cir. 1978); *United States v. Ruigomez*, 576 F.2d 1149 (5th Cir. 1978); *United States v. Papa*, 533 F.2d 815 (2d Cir. 1976); *United States v. Young*, 503 F.2d 1072 (3d Cir. 1974); *United States v. Mallah*, 503 F.2d 971 (2d Cir. 1974), *cert. denied*, 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Palermo*, 410 F.2d 468 (7th Cir. 1969); *Short v. United States*, 91 F.2d 614 (4th Cir. 1937).

evidence actually adduced by the government. Therefore, we cannot simply lay the actual evidence in the proposed Hawaii trial against the record produced at the Kansas trial, and determine in light of *Arnold* whether the two indictments charge the same conspiracy. Plenary review by this court of the Hawaii court's decision would be appropriate if the proof were already adduced or that to be adduced was undisputed. *United States v. Guido*, 597 F.2d 194, 197–98 (9th Cir. 1979) (per curiam), so holds.

■ It is quite different when, as here, an interlocutory appeal is brought alleging double jeopardy and the plenary review standard of *Guido* is not applicable because the exemplar of proposed facts of the second case is in dispute since they have not been tried. The government has made a proffer of the evidence it expects to produce at the Hawaii trial. Appellants dispute parts of the government's proof. Thus the district court is confronted with a summary of the evidence the government hopes to develop at trial, untested by the adversary trial process and the future shape of which is disputed by appellants. From this proffer, appellants' challenges to it, and by comparison with the record of the Kansas trial, the district court must determine whether the same conspiracy is charged in Hawaii as was tried in Kansas. The district court must essentially determine what the second trial will actually show, and use those findings in applying the *Arnold* factors; this court must accept the district court's analysis and resolution of the government's proffer of fact unless they are deemed clearly erroneous. Our further analysis consequently requires review of those findings and their acceptance unless they are clearly erroneous.

### D.

In brief, the evidence produced at trial in Kansas and the showing presented by prosecutors in Hawaii tend to establish that Mucci and Bendis met with Phillip Kitzer in Cleveland on March 2, 1977. Kitzer was the owner of Seven Oaks Finance, Ltd., a small British bank which, for a fee, would provide bogus letters of credit. Kitzer suggested at the meeting that Seven Oaks letters of credit might be useful in defrauding Hawaiian building contractors seeking financing commitments for their construction projects.[6] Kitzer, Mucci and Bendis planned to prepare such commitments, using spurious letters of credit to convince builders and short-term lenders that the permanent commitment was legitimate and the lenders solvent. Andrew D'Amato was brought into the scheme because of his ability to draft take-out documents in language permitting appellants to avoid ever having to make good on financing. D'Amato traveled to Cleveland and joined the scheme to. sell worthless take-out commitments for advance fees.

At a meeting in Cleveland on March 3, Kitzer, Mucci, Bendis, D'Amato, and two undercover FBI agents who had infiltrated the scheme acting as Kitzer's associates, met to work out the details of the Hawaii fraud. D'Amato was to travel to Miami with Kitzer, who was in the process of arranging a meeting with Hawaiian builders Leong and Kealoha. D'Amato would represent himself as agent of Euro-Afro-Asiatic Trust (Trust). The undercover agents were to act on behalf of a corporation to be formed and known as Island Investors (Island). Island would represent itself as a prospective purchaser of completed building projects and the Trust would agree to provide permanent financing and take-out commitments in exchange for advance fees. Bendis was to act as attorney for Island, although it was later agreed that Bendis would act as a principal of Island. The conspirators recognized that the success of the fraud hinged on convincing short-

---

**6.** Building construction often requires both short-term financing while construction is underway and permanent financing after project completion. Usually, the permanent financing must be arranged at the outset. Permanent lenders will therefore provide a "take-out commitment" in exchange for an advance fee. The commitment is a contractual pledge by the lender to provide permanent financing once the project is complete.

term lenders that the take-out commitments were bona fide, as the conspirators contemplated their advance fees would likely come from short-term loans.

Leong met with Kitzer in Miami on March 4 and discussed possible construction financing. D'Amato arrived late, however, and his planned meeting with Leong was not possible.

Later in March, Kitzer arranged for Kealoha to travel to Miami, where he met with D'Amato and Mark Iuteri, who acted as appraiser for the Trust. Together they discussed a take-out commitment and agreed that the three would travel to Honolulu at Kealoha's expense to inspect construction sites.

By March 27, D'Amato, Kitzer, the undercover agents and Iuteri had arrived in Honolulu. They met with Kealoha and Leong. A commitment for Kealoha was arranged, contingent on payment of an $80,000.00 advance fee. Before the fee was paid, local FBI agents interviewed D'Amato about the Trust and its American business activities. This development caused a change in plans; it was agreed that Kealoha and Leong should be induced to travel outside the United States for purposes of paying advance fees.

Kealoha was induced to travel to Germany and England, where several meetings were conducted. He returned to Virginia, where he was contacted by D'Amato and told that the Trust had approved the commitment and documents were waiting in Connecticut. Kealoha traveled to Connecticut and paid $12,500.00 for the commitment, by check dated April 29, 1977. Subsequent-

ly, he discovered that the commitment was unacceptable and he had no further dealings with the appellants. The attempt to defraud Leong did not progress beyond the Hawaii meetings.

The Kansas indictment relates to events subsequent to the Hawaii fraud. In May 1977, D'Amato needed quick cash. At a meeting in Cleveland, Kitzer described to Bendis, Mucci and D'Amato a successful advance fee fraud being operated in New York by Alfredo Proc, known as Fred Pro. Together, appellants and Kitzer traveled to New York and met with Pro, who described his scheme and his need for commercial paper which appeared legitimate. A possible sale of Seven Oaks paper was discussed but not consummated.

On June 6, 1977, Bendis, Mucci, D'Amato, Kitzer and the undercover agents met in Cleveland. Pro needed help in negotiating a $110,000.00 money order which had been acquired by fraud. Mangiamelli, an associate of Pro, arrived with the money order. Appellants arranged to have the money order cashed.

In addition to the evidence relating to the money order and its negotiation, the district court in Kansas permitted introduction of evidence of the Hawaii fraud scheme, concluding that the Hawaii transactions were sufficiently similar to the conduct charged in Kansas as to be admissible under Fed.R. Evid. 404(b).[7]

**E.**

▮ The district court's determination that distinct conspiracies were charged in

---

7. In addition to this evidence directly related to the conspiracies charged, the government's evidence includes a January 1977 meeting between Kitzer, Bendis and Mucci at which they discussed possible use of bogus Seven Oaks letters of credit in persuading bankruptcy creditors of the Shaker House Hotel to permit Bendis and Mucci to take over the hotel. Evidence of this transaction was introduced by the court in Kansas as evidence of related transactions admissible under Fed.R.Evid. 404(b).

The government also sought to introduce in Kansas evidence that Mucci had offered undercover FBI agents stolen bonds for use as collat-

eral in obtaining bank loans. The offer came at a meeting attended by Bendis, Mucci, Kitzer and the agents. No sale was made. The district court in Kansas excluded this evidence invoking Tenth Circuit case law which suggests it was not sufficiently similar to the fraud charged in the indictment.

This evidence does not bear directly on our double jeopardy analysis because it does not relate directly to the charges either in Kansas or Hawaii. Nonetheless, we find nothing in these distinct, separate criminal transactions which alters the result in this case.

Kansas and Hawaii must be affirmed on this record.[8]

Different time periods characterize the two conspiracies. Significantly, there appears no overlap in the time when the conspiracies were underway. When appellants met in June to arrange for negotiation of Pro's check, all efforts to sell take-out commitments in Hawaii had been completed. *Compare United States v. Tammaro*, 636 F.2d 100, 104 (5th Cir. 1981) (applying *Arnold*, separate conspiracies may have been close in time but did not overlap).

Both conspiracies had important connections with Cleveland, Ohio. Equally true, however, is that each implicated distinct parts of the world which the other did not. The Hawaii fraud was peculiarly aimed at Hawaiian builders and had, as one of its apparent objects, inducing the builders to travel outside the United States. Negotiation of Pro's check, however, was much more limited in geographic scope, embracing meetings in New York and Cleveland and a bank in Kansas where the money order was cashed. *Compare United States v. Tammaro, supra* (may be some overlap in geographic location of conspiracy, but also important differences); *and United States v. Mayo, supra*, 646 F.2d at 373 (coincidental overlap of Colombian ranch in two conspiracies not significant).

The overt acts charged in the indictments are completely distinct. Also, the grouping of co-conspirators varies significantly. Pro and Mangiamelli played no role in the Hawaii frauds and Iuteri was uninvolved in the Kansas conspiracy.

Finally, both conspiracies charge violations of different statutory sections. The Kansas conspiracy was aimed at violation of 18 U.S.C. § 2314, by causing interstate transportation of the fraudulently obtained money order. The Hawaii conspiracy envisioned interstate travel of persons in furtherance of the fraud, 18 U.S.C. § 2314, and

use of wire communication to further the fraud, 18 U.S.C. § 1343. Of significance is the distinctive character of the criminal activity contemplated as objects of the conspiracies. Appellants conspired in Kansas to negotiate a fraudulently obtained check, while in Hawaii the agreement was more far reaching, requiring an elaborate plan to perpetrate the fraud as well as to cash the proceeds.

No one component of the *Arnold* analysis has controlling significance. "[T]he essence of the double jeopardy determination in a conspiracy case [remains] whether there is more than one agreement." *United States v. Stricklin*, 591 F.2d 1112, 1125 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979) (applying *Arnold* analysis). On this record, however, each of the *Arnold* factors suggests that separate conspiracies are charged and the district court properly declined to dismiss the Hawaii indictment.

### III

Appellants' vindictive prosecution claim rests on their allegation that the Hawaii prosecution occurred only because sentences imposed after conviction in Kansas were reduced. Appellant Bendis was originally sentenced in Kansas to five years imprisonment. On April 5, 1979, that sentence was reduced to one year upon motion filed February 13, 1979. On May 11, 1979, the sentence was further reduced to six months. Appellant Mucci's sentence was never reduced from the five years originally imposed. Appellant D'Amato's sentence was reduced in December 1979.

■ A prima facie showing of vindictiveness must be made by a defendant before the government will be required to present rebuttal evidence. *See, e. g., United States v. Griffin, supra*, 617 F.2d at 1347. "In most cases, this involves a showing that the prosecutor has re-indicted the defendants

---

**8.** As we said in *United States v. Solano, supra*, 605 F.2d at 1144, appellants remain free to renew their claim of double jeopardy after completion of the second trial when a record will permit more complete evaluation of the dimen-

sions of the conspiracy actually proven in Hawaii. Of course, if the trial record proves to be little different from the proffer, the renewed double jeopardy claim may be disposed of based on our analysis in Part E of this opinion.

and increased the severity of the charge, after the defendants have exercised a statutory or constitutional right." *United States v. Burt*, 619 F.2d 831, 836 (9th Cir. 1980); *United States v. Rosales-Lopez*, 617 F.2d 1349, 1357 (9th Cir. 1980), *aff'd*, 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *United States v. Ruesga-Martinez*, 534 F.2d 1367, 1369 (9th Cir. 1976). If a prima facie case is made, the burden shifts to the government to justify the second prosecution by independent reasons and thus dispel the appearance of vindictiveness. *United States v. Burt, supra*, 619 F.2d at 836.

Even if we assume for purposes of this appeal that a prima facie case was made, a question we do not decide, the government adequately established that the sentences imposed in Kansas played no role in initiating the Hawaii proceedings. The undisputed affidavit of the prosecutor so indicates. As to each defendant, it is clear that the decision to proceed in Hawaii was made before any sentence was altered in Kansas. A subpoena to witness Leong, directing his appearance before the Hawaii grand jury, was issued on February 8, 1979, five days before Bendis sought a reduction of sentence in Kansas and nearly two months before the court granted Bendis' motion. The grand jury began considering this case on February 16, 1979, a full month and one-half before the first sentence reduction of any defendant in Kansas. When the decision to proceed is made before the defendant asserts the right which he alleges the government seeks to punish him for asserting, any allegation of vindictiveness in fact or appearance is successfully dispelled. *See, e. g., United States v. Burt, supra*, 619 F.2d at 837–38.

Appellants suggest, nonetheless, that even if the sentences in Kansas did not motivate the Hawaii prosecution, an appearance of vindictiveness remains because the Hawaii indictment followed sentence reduction in Kansas and that the mere appearance requires dismissal of the indictment. This is not the law. The government may always rebut an appearance of vindictiveness arising from a circumstantial chain of events. *See id.; compare United States v. Hollywood Motor Car Co.*, 646 F.2d 384, 387–88 (9th Cir. 1981) (different principles may apply when undisputed, express threats are made by prosecutors). Whether or not such an appearance arose in this case, the government has established that this is not a vindictive prosecution.

## IV

Appellants' remaining claims are dismissed for want of jurisdiction under 28 U.S.C. § 1291. The right to an interlocutory appeal is extremely limited. *See Abney v. United States, supra*, 431 U.S. at 651, 97 S.Ct. at 2035. It does not bring up for early appellate review claims, such as by appellants here, that their constitutional or statutory rights to a speedy trial have been violated. *See United States v. MacDonald*, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978) (constitutional right); *United States v. Mehrmanesh*, 652 F.2d 766 (9th Cir. 1981) (statutory right).

A motion to dismiss a grand jury indictment because of alleged grand jury irregularities is also not immediately appealable before trial. *See United States v. Garner*, 632 F.2d 758, 765 (9th Cir. 1980), *cert. denied*, 450 U.S. 923, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981). Accordingly, the appeal from the order denying the motion to dismiss the indictment because of allegedly unfair presentation of evidence to the grand jury is dismissed.

*AFFIRMED IN PART, DISMISSED IN PART.*