**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Louis ZISKIN, Defendant–Appellant.**

No. 02–50443.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 2003.

Filed Dec. 15, 2003.

Charles M. Sevilla, Cleary & Sevilla, San Diego, CA, for the Appellant.

Jean M. Mohrbacher, Assistant U.S. Attorney, Los Angeles, CA, for the Appellee.

Before: ALDISERT,* TALLMAN and RAWLINSON, Circuit Judges.

ALDISERT, Circuit Judge.

This is an interlocutory appeal from an Order of the United States District Court for the Central District of California denying Appellant Louis Ziskin's motion to dismiss on double jeopardy grounds three counts of an indictment for conspiring to import, possess and distribute "ecstasy" in violation of 21 U.S.C. §§ 963 and 846 and engaging in a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848. Ziskin contends that the district court erred in denying his motion to dismiss the conspiracy counts (Counts 1 and 8, respectively) because he had already been convicted under an earlier indictment for the conspiracy charged in this second indictment. He also argues that the district court improperly failed to dismiss the CCE count (Count 13) because the conspiracy for which he was convicted in the prior indictment is a lesser-included offense of the CCE charge in this indictment.

As a threshold matter, we must determine the appropriate standard of review. We conclude that the district court's denial of Ziskin's motion to dismiss based on double jeopardy is reviewed de novo, but the district court's underlying factual determinations are reviewed for clear error. Our primary responsibility is to decide whether the district court committed reversible error in determining in this fact-driven case that Ziskin participated in two distinct conspiracies—one covered in the prior adjudicated case and one encom-

passed in the present indictment. We hold that the district court did not err.

The United States District Court for the Central District of California had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction under the *Abney* collateral order exception to 28 U.S.C. § 1291. *See Abney v. United States*, 431 U.S. 651, 662, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (holding that rejection of a criminal defendant's double jeopardy defense may be appealed before final judgment).

I.

This case involves the largest-ever United States government seizure of the drug 3,4–methylenedioxymethamphet amine, more commonly known as ecstasy.

In late 1998, Louis Ziskin established himself as a major ecstasy importer in the Los Angeles area, participating in and leading a large and sophisticated operation that imported the drug from sources in the Netherlands by way of other countries in Europe. Initially, Ziskin flew to Europe carrying large amounts of cash, purchased ecstasy and then flew back to the United States with the drugs.

By early 1999, Ziskin had enlisted Tamer Ibrahim and Alexander Maimon to travel with him to Europe to purchase ecstasy for cash. At first, they paid for the drugs by pooling their money and carrying the cash with them to Europe—a simple magnification of the method already used by Ziskin. But with Ibrahim and Maimon on board, Ziskin's operation grew progressively more complex. As investors in the scheme, Ibrahim and Maimon began to accompany Ziskin to Europe to purchase large amounts of ecstasy and arrange to

---

* The Honorable Ruggero J. Aldisert, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

have it shipped back to the United States via Federal Express or another courier service. Each Federal Express box could contain up to 50,000 tablets of ecstasy. Later, the trio shipped cocaine to Europe in exchange for shipments of ecstasy.

During the course of this operation, Ibrahim introduced Ziskin to Mounir Deiri, who located mailing addresses in the Los Angeles area to which the ecstasy packages could be sent. Deiri received, stored and divided up the ecstasy. Deiri sometimes distributed it for Ziskin and Ibrahim and collected proceeds for the sales. Deiri also handled the shipment of cocaine from the American end of the business. Tamer Ibrahim's cousin, John Ibrahim, assisted Deiri with many of these duties, even lining up two storage units— one for Ziskin's share of drugs and one for Tamer Ibrahim's share. Deiri and John Ibrahim supervised various couriers, including Dwayne Sanker, Lance White, Lori Lynne Johnson, Sonya McDaniel and Amenah Jackson, who used their own addresses to receive the ecstasy before turning it over to Deiri or John Ibrahim. Ziskin compensated Deiri with ecstasy and a $60,000 Cartier watch.

Throughout 1999, the United States Customs Service ("USCS") intercepted numerous Federal Express and DHL packages containing multi-kilogram amounts of ecstasy sent from European countries to various commercial mailbox centers in the Los Angeles area. In mid-July 1999, the USCS made a controlled delivery of one of the packages to one such commercial mailbox center. After Deiri picked up the package of ecstasy and attempted to deliver some of the shipment to one of Ziskin's customers, the USCS arrested Deiri. Tamer Ibrahim hired a lawyer to defend Deiri against federal charges in the United States District Court for the Central District of California and shared the costs

with Ziskin and Deiri. At the time of Deiri's arrest, Tamer Ibrahim and Ziskin also began to have problems with one another.

Deiri stayed in jail for about a month, during which the pace of ecstasy transactions slowed substantially. He was released from jail on bond in late August 1999, the same time Ziskin returned from a trip to Europe. Ziskin offered Deiri $250,000 to leave the United States to work with Ziskin's drug contacts in Europe, but Deiri rejected the offer. Ziskin gave Deiri and Tamer Ibrahim large quantities of ecstasy to jumpstart transactions. By October 1999, the conspiracy's trafficking had picked up again and Ziskin and Tamer Ibrahim had set up their own crews in Amsterdam.

In late December 1999, the USCS intercepted three ecstasy-filled packages from France, all bound for Los Angeles. Couriers Johnson, McDaniel and Jackson picked them up. McDaniel and Jackson were arrested on December 21, 1999, but they agreed to cooperate with the USCS to deliver the packages to Deiri as planned. Deiri instructed the couriers to deliver the packages to John Ibrahim. After that delivery, the USCS seized the packages, searched the apartments of Deiri, John Ibrahim and Maimon, and arrested John Ibrahim. Including what it found at the two storage units, the USCS seized more than 700 pounds of ecstasy and more than $1 million cash on December 22, 1999.

The government produced evidence that these seizures drove Ziskin and Tamer Ibrahim apart. Deiri told government investigators that Tamer Ibrahim, Maimon and Deiri became disenchanted with Ziskin. Deiri believed Ziskin owed him $1.2 million to compensate for the losses Deiri sustained in the December 1999 seizures. Deiri said that he and Tamer Ibrahim broke away from Ziskin at that point to

establish their own, separate drug-trafficking operation.

At first, Deiri and Tamer Ibrahim tried the same methods they had used while working with Ziskin, but with different people. Deiri and Tamer Ibrahim enlisted a new cocaine supplier in the person of Jose Antonio Cortes. While lying to Ziskin to cover up his new drug-trafficking operation, Tamer Ibrahim sent Joseph Yavetz and Michael Helo to the Netherlands to export ecstasy via Federal Express. When Yavetz and Helo were arrested in Germany in February 2000, Ziskin became angry because he realized that Tamer Ibrahim had started a new enterprise without him.

The arrests of Yavetz and Helo prompted Deiri and Tamer Ibrahim to look for a different means of importing ecstasy—one that would also provide for larger shipments than the air courier method. David Reziniano told Deiri and Tamer Ibrahim about a plan that would allow millions of ecstasy tablets to be shipped at once rather than just the 50,000 tablets that could be sent in each Federal Express package. The new idea was (1) to ship large quantities of ecstasy from Europe to the United States through South Korea; (2) to conceal the drugs in clothing and other legitimate merchandise; and (3) to bribe international customs officials to allow passage. This scheme concealed the fact that the shipments originated in the Netherlands, the leading source country for ecstasy. Ziskin was told about this plan before the December 1999 seizures, but he declined to adopt it.

Deiri and Tamer Ibrahim, however, agreed to try it with Jiha Ryu and Min Sung Jin, two Korean importers who had relationships with shipping companies in France and elsewhere. Joseph Gilboa delivered boxes of ecstasy to the particular shipping company designated by Jin, and the company sent the bulk shipments as air freight from Europe to South Korea. In South Korea, the ecstasy was packaged among clothing and other legitimate merchandise and invoice documents were altered. Ryu and Jin bribed Korean customs officials. Eventually, the shipments arrived at a bonded warehouse in Los Angeles, where a United States Customs agent had been bribed to ensure safe passage of the packages.

In February 2000, Tamer Ibrahim and Deiri tested the new method with a small shipment hidden in socks inside a Federal Express box. The box was repackaged in South Korea and then sent to Los Angeles without detection. In early March 2000, Ibrahim and Deiri successfully shipped a larger amount of ecstasy from France to South Korea to Los Angeles. From then on, Tamer Ibrahim and Deiri increased the size of the shipments and ceased using Federal Express boxes. Over the next several months, four shipments originating in Europe arrived in Los Angeles via this method.

It is uncontroverted that Ziskin did not participate in this new ecstasy trafficking method from its inception in February 2000 through June 2000. During that time, Ziskin continued to conduct his own trafficking operation using Federal Express shipments. Ziskin sent cocaine to England and then withdrew the proceeds from an English bank to purchase ecstasy. Although Tamer Ibrahim and Deiri were no longer involved with Ziskin's operations, Deiri was told that a March 2000 shipment seized in Boston and an April 2000 shipment seized in Italy belonged to Ziskin's organization.

Still under pressure from Tamer Ibrahim and Deiri to repay Deiri for the December 1999 ecstasy seizures by the USCS, Ziskin participated in three drug transactions with Tamer Ibrahim and

Deiri in 2000. Ziskin joined Tamer Ibrahim and Deiri in sending one or two cocaine shipments to Europe in early 2000. In June 2000, Ziskin agreed to allow Tamer Ibrahim and Deiri to ship some of Ziskin's ecstasy through Korea so Ziskin could get money to repay Deiri.

The final shipment of Tamer Ibrahim's enterprise, comprised of 2.1 million tablets of ecstasy, was seized at Los Angeles International Airport on July 22, 2000. Law enforcement officers monitored preparations for this large shipment by wiretapping Tamer Ibrahim's telephone. The intercepted calls not only revealed Tamer Ibrahim making arrangements with Ryu, Reziniano, Gilboa and Cortes but also showed Tamer Ibrahim instructing Ziskin how to prepare ecstasy for inclusion in the shipment.

In preparing for the July shipment, Tamer Ibrahim did not receive instructions from Ziskin nor did he tell Ziskin how the shipments to Los Angeles would be made. Tamer Ibrahim rejected an impatient Ziskin's demands to send the ecstasy by Federal Express. Intercepted calls suggest that Ziskin and Tamer Ibrahim were now running trafficking crews completely independent of one another. For example, Tamer Ibrahim explained that shipment delays were on "my side." In another call, Tamer Ibrahim instructed Gilboa to meet with Ziskin's "kid," a Ziskin underling who would facilitate inclusion of Ziskin's ecstasy in Tamer Ibrahim's shipment. In a separate call, Ziskin discussed with Tamer Ibrahim the anticipated meeting between the Ziskin underling and Tamer Ibrahim's "boy," presumably Gilboa, who would make the exchange.

## II.

Federal authorities took Ziskin into custody in December 2000. Based on information from Deiri and John Ibrahim, Ziskin was charged in CR 00–24(D)–RSWL, for transactions beginning in *November 1999* and continuing up until the seizures of *December 22, 1999.* Specifically, Ziskin was indicted on December 7, 2000 on two counts of importation of ecstasy, in violation of 21 U.S.C. § 952; one count of conspiracy to import ecstasy, in violation of 21 U.S.C. § 963; and one count of conspiracy to possess with intent to distribute ecstasy, in violation of 21 U.S.C. § 846. Ziskin was convicted after a trial that began in early March 2001 and sentenced to a 30–year term of imprisonment.

On December 14, 2000, Ziskin was charged in an indictment in the instant case, CR 00–852(D)–CAS, stemming from drug-trafficking actions that took place between *January 2000* and *September 2000.* On October 31, 2001, a federal grand jury returned a Sixth Superceding Indictment, charging Ziskin alongside nine co-defendants. In this indictment, Ziskin was charged in: (1) Count 1 with conspiracy to import ecstasy, in violation of 21 U.S.C. § 963; (2) Count 4 with importation of ecstasy, in violation of 21 U.S.C. § 952; (3) Count 5 with distribution of ecstasy with intent to import ecstasy to the United States, in violation of 21 U.S.C. § 959; (4) Count 8 with conspiracy to possess with intent to distribute ecstasy and conspiracy to distribute cocaine and ecstasy, in violation of 21 U.S.C. § 846; and (5) Count 13 with engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848.

On April 25, 2002, Ziskin filed a motion to dismiss Counts 1, 8 and 13 on double jeopardy grounds. Following a hearing on the motion, the district court filed a written order on August 14, 2002 denying Ziskin's motion to dismiss. On August 26, 2002, Ziskin filed a timely Notice of Appeal.

## III.

We must first clear the decks and determine the proper standard of review. The standard of review we must apply is the subject of some disagreement between the parties. Ultimately, however, the standard of review is readily apparent: We review the district court's denial of the motion to dismiss, a legal question, de novo, but we must accept the district court's factual findings unless they are clearly erroneous. *United States v. Lun,* 944 F.2d 642, 644 (9th Cir.1991) ("A district court's denial of a motion to dismiss on double jeopardy grounds is generally reviewed *de novo.* ... However, factual findings concerning governmental conduct, upon which the denial is based, are reviewed for 'clear error.'") (citations omitted).

To be sure, some of our cases could be interpreted to suggest that de novo review is appropriate when facts are undisputed, such as after a final judgment, while clearly erroneous review is appropriate when facts remain in dispute, such as on interlocutory appeal. *See United States v. Guido,* 597 F.2d 194, 197–198 (9th Cir.1979) (per curiam) ("The government contends that the standard of review on this appeal is the 'clearly erroneous' standard relative to facts found by the trial court.... We do not agree. The standard here applicable is solely one of law because the facts are undisputed.") (citations omitted); *United States v. Bendis,* 681 F.2d 561, 566 (9th Cir.1981) ("[T]he plenary review standard of *Guido* is not applicable because the exemplar of proposed facts of the second case is in dispute since they have not been tried.").

The matter is complicated further by our holding in *United States v. Stoddard,* 111 F.3d 1450 (9th Cir.1997), which Ziskin relies on in contending that we must apply a de novo standard of review. In seeming conflict with *Bendis,* the panel in *Stoddard* reviewed de novo the district court's denial of a motion to dismiss based on double jeopardy even though a trial had yet to take place. 111 F.3d at 1454.

Examining these cases closely, however, we conclude that there is no conflict in our cases and that our precedents are consistent and in line with those of our sister courts of appeals. The factor determining the standard of review is not whether the facts are disputed nor whether the appeal is from a final judgment; rather, it turns on whether the district court has answered a legal question or made a factual determination. *See Lun,* 944 F.2d at 644; *United States v. Cartagena–Carrasquillo,* 70 F.3d 706, 714 (1st Cir. 1995) ("[F]act findings are subject to a clearly erroneous standard of review.... The trial court's denial of defendants' motion to dismiss based on double jeopardy is [a legal question] subject to *de novo* review." (citations omitted)); *United States v. Vallejo,* 297 F.3d 1154, 1162 (11th Cir. 2002) (stating, on appeal from a conviction allegedly in violation of the Double Jeopardy Clause, that "[w]e review the district court's factual finding for clear error and its application of the law to those facts *de novo*") (citation omitted); *United States v. Delgado,* 256 F.3d 264, 270 (5th Cir.2001) (same); *United States v. Leon–Delfis,* 203 F.3d 103, 115 (1st Cir.2000) (same on appeal from a sentence ordering restitution); *United States v. German,* 76 F.3d 315, 317–318 (10th Cir.1996) (same on interlocutory appeal of denial of motion to dismiss indictment on double jeopardy grounds); *United States v. McHan,* 966 F.2d 134, 138 (4th Cir.1992) (same).

In reality, *Guido, Bendis* and *Stoddard* do not contradict one another. In *Guido,* where the facts were undisputed, we recognized that there were no factual determinations to review and applied a de novo

standard of review to the purely *legal* question of whether the district court properly granted a motion to dismiss based on double jeopardy. 597 F.2d at 197–198. In *Stoddard,* we reiterated that this plenary standard of review applies for *legal* questions in the context of an interlocutory appeal. 111 F.3d at 1454. In *Bendis,* where the facts were disputed, we emphasized that we would review the district court's *factual* determinations for clear error. 681 F.2d at 566. These precedents are in harmony with the dual standards of review we apply in the instant case.

We now emphasize that on appeal of a district court's decision on double jeopardy, whether the appeal comes to us before trial as permitted by *Abney* or after a final judgment, we review de novo legal questions such as denial of a motion to dismiss or a motion for judgment of acquittal, and we review factual findings, including those on which denial may be based, for clear error. *Lun,* 944 F.2d at 644; *Cartagena–Carrasquillo,* 70 F.3d at 714. We now turn to the merits of this appeal.

IV.

■ The Fifth Amendment's Double Jeopardy Clause provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. The Clause prohibits the government from splitting a single conspiracy into separate charges and bringing successive prosecutions against a defendant. *United States v. Guzman,* 852 F.2d 1117, 1119 (9th Cir.1988); *see also Braverman v. United States,* 317 U.S. 49, 53, 63 S.Ct. 99, 87 L.Ed. 23 (1942) ("Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which [a] statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.").

A.

■ The defendant bears the burden of showing that the two conspiracies charged actually arise from a single agreement. *United States v. Montgomery,* 150 F.3d 983, 990 (9th Cir.1998). Specifically, to sustain his claim of double jeopardy, Ziskin must demonstrate "that the two conspiracies are indistinguishable in law and in fact." *Guzman,* 852 F.2d at 1120 (citation omitted). In contrast to a post-trial appeal, this burden is more nuanced in an interlocutory appeal, when "[t]he second trial has not yet occurred and the government is in the better position to know what it expects to prove at that trial." *Bendis,* 681 F.2d at 564. In addition, Ziskin is understandably reluctant to reveal his anticipated defense theory or to inadvertently waive his privilege against self-incrimination.

■ Once the defendant makes an initial non-frivolous showing of double jeopardy, "the government must tender to the court evidence indicating that separate conspiracies are charged." *Id.* Although "this appears more properly characterized as a burden to go forward with the evidence, it may in practical effect amount to a burden to persuade the court." *Id.* The burden of proof, however, does not shift to the government and remains with the defendant. *Id.*

Ziskin asserted in separate but similar motions to dismiss, dated August 13, 2001 and April 25, 2002, that the two conspiracy counts at issue in this indictment should be dismissed on double jeopardy grounds. In response, the government tendered evidence demonstrating that it had charged

Ziskin with participation in independent conspiracies. Specifically, the government proffered (1) a portion of the government's trial memorandum in CR 00–24(D)–RSWL, summarizing the evidence in that case; (2) a report of an interview of Deiri in which he described the development of the second conspiracy; (3) three reports of interviews of Gilboa, in which he outlined how Tamer Ibrahim's enterprise developed the airfreight-via-South-Korea method of importing ecstasy; and (4) a report of an interview of Ryu, in which he also detailed the new method.

In Orders dated October 23, 2001 and August 14, 2002, the district court denied Ziskin's motions to dismiss. Although the district court apparently concluded that Ziskin had made an initial non-frivolous showing of double jeopardy, it ultimately found the government's proffered evidence dispositive. In effect, the district court concluded that although Ziskin may have met his initial burden of production, he failed to meet his ultimate burden of proof to show "that the two conspiracies are indistinguishable in law and in fact." *Guzman*, 852 F.2d at 1120. Essentially, then, the district court concluded that Ziskin participated in two separate conspiracies. We must now determine whether the district court's findings of fact were clearly erroneous and its application of legal precepts to those findings was in accordance with the law.

### B.

■ In *Arnold v. United States*, 336 F.2d 347, 350 (9th Cir.1964), we adopted a test to determine whether two conspiracy counts charge the same offense and thus place the defendant in double jeopardy. As explained in subsequent cases, under the *Arnold* test, "we consider five factors: (1) the differences in the periods of time covered by the alleged conspiracies; (2)

the places where the conspiracies were alleged to occur; (3) the persons charged as coconspirators; (4) the overt acts alleged to have been committed; and (5) the statutes alleged to have been violated." *Montgomery*, 150 F.3d at 990 (citation omitted). The district court did not err in choosing the *Arnold* test as the polestar in this case. Cardozo taught us:

> Of the cases that come before the court in which I sit, a majority, I think, could not, with semblance of reason, be decided in any way but one. The law and its application alike are plain. Such cases are predestined, so to speak, to affirmance without opinion. In another and considerable percentage, the rule of law is certain, and the application alone doubtful.

Benjamin N. Cardozo, *The Nature of the Judicial Process* 164 (1921).

In the case at bar, "the rule of law is certain"—the *Arnold* test. Our task is to determine the proper application of the facts to the rule of law and determine whether Ziskin met his burden of showing "that the two conspiracies are indistinguishable in law and in fact." *Guzman*, 852 F.2d at 1120 (citation omitted); *see also Montgomery*, 150 F.3d at 990.

■ "No single factor in the . . . analysis controls the determination of whether there was a single conspiracy; after consideration of all, the question is whether there was more than one agreement." *Guzman*, 852 F.2d at 1121 (citing *Bendis*, 681 F.2d at 568). Moreover, " '[t]he fact that there is some interrelationship between conspiracies does not necessarily make them the same criminal enterprise,' where one conspiracy involves unlawful transactions 'quite distinct in their means of execution and their objects.' " *Id.* (quoting *United States v. Ingman*, 541 F.2d 1329, 1331 (9th Cir.1976) (per curiam)).

In denying Ziskin's first motion to dismiss, the district court considered facts relevant to each of the *Arnold* factors. Ultimately, the district court concluded that, on the record before it, Ziskin had not satisfied his burden to show that the conspiracies were indistinguishable. In its denial of Ziskin's second motion to dismiss, the district court stated that Ziskin had offered no factual or legal basis for reconsideration of the court's decision to deny the first motion to dismiss. The court dismissed both motions without prejudice and specifically stated that Ziskin could re-file his motion to dismiss after trial, at which point the factual record would be fully developed.[1]

**1.**

Ziskin contends on appeal that the first factor in the *Arnold* test, the time period, militates in favor of a single conspiracy because there was minimal time between the end of the first alleged conspiracy on December 22, 1999 and the beginning of the second alleged conspiracy in January 2000. The government, however, produced evidence that Ziskin started and led a criminal enterprise from November 1998 until the USCS seizures on December 22, 1999. The government produced further evidence in the form of testimony from Deiri that Tamer Ibrahim no longer desired to work with Ziskin after the seizures. At that point, Tamer Ibrahim and Deiri broke away from Ziskin's enterprise and started a new operation. Soon after, Tamer Ibrahim and Deiri developed a new method of transporting ecstasy.

■ The allegation that Ziskin joined with the new enterprise for a limited purpose in one or two cocaine transactions and a July 2000 ecstasy shipment does not mean that the two alleged conspiracies overlapped or were in fact a single conspiracy. Moreover, the short period of time separating the conspiracies does not preclude a determination that the conspiracies were indeed separate.

**2.**

The second *Arnold* factor addresses the places where the conspiracies occurred. Both alleged conspiracies involve the Netherlands as the source location for ecstasy and Los Angeles as the destination. In the first alleged conspiracy, Ziskin— and, later, Tamer Ibrahim and Maimon— transported ecstasy from the Netherlands to Los Angeles by personally carrying it on airplanes. As the operation grew larger and more complex, the ecstasy was carried from the Netherlands to other European countries, such as Germany and France, before being shipped via Federal Express or DHL to Los Angeles.

The second alleged conspiracy, led by Tamer Ibrahim and Deiri, also initially utilized Federal Express or DHL outposts in Europe to ship ecstasy to Los Angeles. However, after Yavetz and Helo were arrested in Germany in February 2000, Tamer Ibrahim and Deiri began exploring new methods of shipping ecstasy from Europe. They adopted Reziniano's idea of shipping the ecstasy to South Korea, where it was repackaged with legitimate merchandise before being sent to Los Angeles.

---

**1.** It must be emphasized that our review is limited to the motion to dismiss the indictment. The district court left the door open for Ziskin to present a motion for judgment of acquittal in accordance with Rule 29 of the Federal Rules of Criminal Procedure: "Due to the fact-intensive nature of the inquiry, the evidence necessary to determine whether Ziskin was involved in a single conspiracy or multiple conspiracies may not be available until the conclusion of a trial on the pending conspiracy counts. Therefore, the Court again denies Ziskin's motion without prejudice to its being renewed." (Order at 6.)

The source location and destination remained unchanged throughout the two alleged conspiracies, but that does not mean the two conspiracies took place in identical locations. As the government points out, drug-trafficking conspiracies often share common points of origin, such as Colombia for cocaine and the Netherlands for ecstasy, and destinations, such as Los Angeles, New York City and Miami. The government produced evidence to show that the imposition of South Korea, a new place, as a transfer point allowed significantly larger amounts of ecstasy to be imported from Europe in the second conspiracy. Accordingly, the places of the two alleged conspiracies were not exactly the same.

### 3.

Ziskin contends that, with the exception of some minor participants, the members of the first conspiracy all continued to engage in drug-trafficking well into 2000. He argues that the "crippling blow" allegedly dealt to the first conspiracy by the USCS seizures in December 1999 was in fact merely a roundup of low-level participants. He asserts that the major players continued even after December 1999 to import ecstasy from Europe to Los Angeles as they had before. The government concedes that there is some overlap in personnel but asserts that the conspiracies were different because the roles played by the conspirators varied.

 "The involvement of [identical conspirators] in both conspiracies does not compel a finding that a single conspiracy existed.... We must determine whether the roles performed by the overlapping members were different in each conspiracy." *Montgomery,* 150 F.3d at 991 (citing *Guzman,* 852 F.2d at 1120 (focusing on the overlapping members' functions in each conspiracy)).

The first indictment named Ziskin, Deiri and Maimon as co-conspirators along with couriers Johnson, Sanker and White. Tamer Ibrahim, John Ibrahim, Adrian Kucuk–Beyaz and couriers McDaniel and Jackson were named as unindicted co-conspirators. The second indictment named Ziskin, Tamer Ibrahim, Reziniano, Ryu, Jin, Cortes and Matthew Abdolmohammadyion as co-conspirators; it named Gilboa, Yavetz and Helo as unindicted co-conspirators. Deiri was not included in the second indictment because he opted to cooperate with the government.

Until the December 22, 1999 seizures, Ziskin headed up the first conspiracy, with Deiri and Tamer Ibrahim playing the major, but secondary, roles of homefront organizer and investor, respectively. Ziskin clearly directed the first alleged conspiracy, including the activities of Tamer Ibrahim and Deiri. Ziskin's status as head of the first conspiracy is highlighted by the fact that he compensated Deiri with ecstasy and a $60,000 Cartier watch.

By contrast, after December 22, 1999, it is clear that Ziskin and Tamer Ibrahim each directed independent enterprises. When Tamer Ibrahim and Deiri broke away from Ziskin after December 22, 1999, Reziniano and Gilboa started working exclusively with the apparently disgruntled pair. Reziniano served up the idea for the South Korean transfer point and Gilboa worked as Ibrahim's "boy," or assistant. Meanwhile, without Ziskin's knowledge, Tamer Ibrahim sent Helo and Yavetz to Europe to secure ecstasy. Tamer Ibrahim also oversaw the involvement of Ryu and Jin in South Korea.

Even as Tamer Ibrahim, Deiri and others took on more prominent roles in their own enterprise, Ziskin conducted his own operations. He sent cocaine to England and then withdrew the proceeds from an English bank to purchase ecstasy. Deiri

was told that law enforcement seizures in Boston in March 2000 and Italy in April 2000 involved Ziskin's ecstasy shipments. Ziskin's involvement with Deiri and Tamer Ibrahim in one or two cocaine transactions and the July 2000 ecstasy shipment apparently stemmed from the pressure he was getting to pay back Deiri for the December 1999 losses.

### 4.

■ Ziskin concedes that the overt acts alleged in the two indictments are not identical, but he contends that the nature of the acts is the same. He also contends that the evidence supporting the two alleged conspiracies is the same, as highlighted by the government's statement that discovery from the first prosecution would be relevant to the second case. The fourth *Arnold* factor, however, clearly militates in favor of a finding of two separate conspiracies.

Count 1 of the first indictment alleged numerous trips taken by Ziskin, Tamer Ibrahim and Maimon to Europe to arrange ecstasy purchases. Most of the other overt acts described in the first indictment were Federal Express or DHL shipments of ecstasy. The remaining overt acts detailed the use of certain addresses for receiving these shipments and facilitating their acquisition by couriers.

By contrast, Count 1 of the second indictment described Tamer Ibrahim's enlistment of Gilboa to meet with ecstasy suppliers and the use of Korean intermediaries to ship ecstasy to the United States disguised as legitimate merchandise—an operation in which Ziskin joined only once, in July 2000. Ziskin's broad contention that the overt acts alleged are essentially the same because they involved the importation of ecstasy is misplaced because of the real distinctions between the two indictments.

### 5.

■ "When the two conspiracies charged violate the same statute, we consider 'whether the goals of the two conspiracies were similar.'" *Montgomery,* 150 F.3d at 991 (quoting *Stoddard,* 111 F.3d at 1456). Different goals suggest the existence of two distinct conspiracies. *See Stoddard,* 111 F.3d at 1456 (finding that the existence of two conspiracies is indicated where one conspiracy's goal was the purchase of marijuana and the other conspiracy's goal was the growth, sale and distribution of marijuana); *Guzman,* 852 F.2d at 1121 (finding that the goal of one conspiracy to distribute cocaine differed from the goal of the other conspiracy to manufacture cocaine).

In this second indictment, Ziskin is charged with violating the same statutes that he was convicted of violating in the first indictment. The government contends that the goal of the first conspiracy was, plainly and simply, to import and distribute ecstasy. Although the second conspiracy broadly shared the same goal— to import and distribute drugs—the government asserts that Ziskin got on board with the second conspiracy with the intent to pay off some of his debt to Ibrahim and Deiri. The government contends that this admittedly slight difference demonstrates that the conspiracies may have had dissimilar goals.

### 6.

■ The district court did not draw conclusions as to whether the first, second, third and fifth *Arnold* factors militated in favor of one or two conspiracies because it viewed the evidence on those factors as inconclusive. With respect to the fourth factor, overt acts, the district court concluded that the facts supported a finding of two conspiracies. Accordingly, in applying

the facts of this case to the legal precept set forth in *Arnold,* the district court concluded that Ziskin had failed to meet his burden of proof to show "that the two conspiracies are indistinguishable in law and in fact." *Guzman,* 852 F.2d at 1120 (citation omitted). Upon de novo review, we are persuaded that the district court did not commit reversible error in reaching this conclusion.

In reviewing the *Arnold* factors, we conclude that the overt acts alleged were different in the first and second indictments. Moreover, the time periods, locations and roles of the members of the conspiracies all differed from the first to the second indictments. In a general sense, the first conspiracy headed by Ziskin relied on rather simple transport methods and remained relatively small in terms of the overall number of ecstasy tablets imported. By contrast, the second conspiracy headed by Tamer Ibrahim became increasingly large and sophisticated primarily because of the Korean repackaging aspect of the enterprise. This analysis leads us to conclude that there were two agreements and, thus, two conspiracies.

■■■ Accordingly, we hold that the district court committed no error of law in concluding that Ziskin failed to meet his burden of proving that the two indictments covered a single conspiracy.

## V.

We now turn to Ziskin's contention that he may not be tried on Count 13, alleging that he participated in a continuing criminal enterprise, because a key element of this offense constitutes a lesser-included offense of the first indictment for which he was tried and found guilty.

■■■ To prove that a defendant is guilty of engaging in a continuing criminal enterprise (CCE), the government must factually establish:

(1) that the defendant's conduct constituted a felony violation of federal narcotics law; (2) that the described conduct occurred as part of a continuing series of violations of federal narcotics law; (3) that the defendant undertook the activity in concert with five or more persons; (4) that the defendant acted as the organizer, supervisor, or manager of the criminal enterprise; and (5) that the defendant obtained substantial income or resources from the purported enterprise.

*United States v. Hernandez–Escarsega,* 886 F.2d 1560, 1570 (9th Cir.1989) (citation omitted).

■■■ As to the second element, we have interpreted the term "continuing series" to require that the government prove the defendant committed three or more federal narcotics violations. *Id.* The government may use any type of drug violation as a predicate offense, including drug conspiracy charges that cover periods within the life of the CCE. *Id.* at 1571. Alleging prior narcotics violations for which the defendant has already been convicted as well as narcotics violations for which the defendant has never been charged does not violate the Double Jeopardy Clause's prohibition on successive prosecutions. *See Garrett v. United States,* 471 U.S. 773, 789–790, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985) (upholding the CCE conviction of a defendant where one of the predicate offenses alleged was the defendant's prior conviction for importation of marijuana).

■■■ Conspiracy is considered a lesser-included offense of a CCE, and a court may not impose punishment for both offenses without violating the Double Jeopardy Clause. *Rutledge v. United States,* 517 U.S. 292, 300, 116 S.Ct. 1241, 134

L.Ed.2d 419 (1996). This is not to say, however, that the Double Jeopardy Clause prohibits a *trial* on both conspiracy and CCE charges; it merely precludes the imposition of cumulative punishments. *See id.* at 307, 116 S.Ct. 1241 (holding that, where the defendant was convicted of both a CCE and a conspiracy to distribute controlled substances that was coextensive in time and conduct to the CCE, one of the convictions had to be vacated because Congress did not intend for cumulative punishments).

 The predicate offenses charged in the CCE count against Ziskin include two substantive counts of importation of ecstasy of which Ziskin has already been convicted based on the seizures made on July 22, 1999 and December 22, 1999. The other predicate offenses charged in the CCE count are taken from the current indictment against Ziskin and include (1) the importation of ecstasy, based on the seizure of a shipment made on July 22, 2000; (2) the distribution of ecstasy; (3) conspiracy to distribute ecstasy; and (4) conspiracy to possess with intent to distribute ecstasy.

Ziskin argues that he cannot now be tried on the CCE count because he has already been convicted of a lesser-included offense—the conspiracy alleged in CR 00–24(D)–RSWL. This claim is based on Ziskin's contention that only one conspiracy existed between November 1998 and September 2000, and that conspiracy is a lesser-included offense of a CCE. Accordingly, he asserts that the government cannot successively prosecute him for the CCE.

Ziskin's contention fails first because he has not met his burden of showing that the two conspiracies are indistinguishable in law and in fact. His argument also falls flat because the government has not alleged the conspiracy of which Ziskin was convicted as one of the CCE's predicate acts. Instead, the government charged two *substantive* convictions as two of the requisite three predicate acts. Ziskin has not yet been convicted of violating—much less, tried on—the additional conspiracy predicate acts; they comprise part of the second indictment. Once again, the Double Jeopardy Clause does not bar a trial on the conspiracy and CCE charges, merely the imposition of cumulative punishment.

Accordingly, the district court did not err in denying Ziskin's motion to dismiss the CCE count.

\* \* \* \* \* \*

We conclude that the district court did not err in denying Ziskin's motion to dismiss the conspiracy counts and the CCE count. We emphasize that our analysis, like that of the district court, is limited to the motion to dismiss the indictment. As indicated about in Part IV.B, Ziskin is not precluded from re-asserting his contentions upon the development of a full record at trial.

AFFIRMED.